Grant GJOVIK, Appellant,

v.

Lawrence STROPE, Respondent,

Lawrence McKee, Respondent,

Martin Gubb, et al., Defendants.

No. C4–86–371.

Court of Appeals of Minnesota.

Aug. 19, 1986.

Review Granted Oct. 17, 1986.

Kurt J. Marben, Thief River Falls, for appellant.

Kenneth F. Johannson, Crookston, for respondent, Lawrence Strope.

Lawrence McKee, pro se.

Heard, considered and decided by CRIPPEN, P.J., and LESLIE and NIERENGARTEN, JJ.

## OPINION

CRIPPEN, Judge.

After a bench trial in this action by appellant Grant Gjovik against Lawrence Strope and Lawrence McKee for breach of a farm sale contract, together with auxiliary agreements, the trial court entered judgment against defendant McKee in the amount requested but dismissed the action against respondent Strope. Gjovik appeals from the judgment dismissing the action against Strope, and we reverse.

## FACTS

In 1979, respondent Lawrence Strope and defendant Lawrence McKee formed the Strope-McKee partnership. On March 1, 1980, Strope and McKee executed a contract with appellant Grant Gjovik for the purchase of 2311 acres of land and a variety of farm machinery, for a total sales price of $2,202,900. The agreement designated the two buyers as "parties of the second part, hereinafter referred to as 'Strope-McKee.'"

In order to reduce the buyers' need for cash for the purchase, the contract also provided that they would assume (1) appellant's obligations as vendee on a contract for deed for 2111 acres of the land, (2) his existing debt with Thorp Credit, Inc., which was secured by some of the machinery and another 200 acre parcel owned by Gjovik and also included in the sale, (3) his obligation on lease contracts with IFG Leasing, Inc. for two grain handling systems, and (4) his vendee's interest in two leases from IFG Leasing on a tractor and a combine. The buyers took possession of the land and equipment on March 1 and began farming.

The contract expressly contemplated the execution of two subsequent agreements: a contract for deed for the 2111 acre parcel, and an assumption of liabilities agreement. All parties signed the contract for deed on March 17, 1980. The assumption agreement, however, was eventually executed only by Gjovik and McKee; although the attorney handling the matter contacted Strope several times asking him to sign and return the document, Strope failed to do so.

At trial, Strope claimed that his signature on the assumptions agreement was

necessary to make the March 1980 contract binding on him. He relied on the contract's provision that the parties agreed to

> enter into an Assumption Agreement at closing as to the various obligations and liabilities referred to herein and further agree to execute any and all other documents required to complete such assumption. Based upon such Documents and Terms being acceptable to Strope-McKee.

Strope testified that the March 1980 agreement was an overall agreement showing the parties' intent to "put [the deal] together," but that this was "assuming that everything worked out." He testified that until the parties reached an "acceptable agreement," it was his understanding that there would be no agreement at all.

Gjovik testified to the contrary that he was never advised by Strope or McKee that there were more details to work out following the signing of the March 1980 agreement. He testified that "as far as [he] was concerned the contracts were all done, they were in their finished form, and they were the final contract."

Appellant's loan with Thorp Credit was secured by a mortgage on the 200 acre parcel of land and a security interest in farm machinery. The loan called for installment payments of $91,162, due annually in May. When the May 1980 installment came due, Strope told Gjovik that the partnership did not have the money to pay the installment. Gjovik agreed to lend the buyers money by making the payment to Thorp on their behalf. In addition, between May and July 1980, Gjovik lent the buyers $12,700 to meet the farm's current expenses. Strope promised Gjovik that they would repay one-half the loans after the 1980 fall harvest and the balance the following spring.

In the fall of 1980, Gjovik received some payments from buyers against the $103,862 he had loaned in the preceding months. Gjovik testified that he discussed repay-

ment of that debt with both Strope and McKee every time he spoke with either of them. Nevertheless, they made no further payments, and in July 1981 a balance of $83,207 remained on the debt. On July 15, McKee signed a promissory note to Gjovik in that amount, promising to completely pay the note by October 15, 1981. Gjovik testified that he accepted the note without Strope's signature because he "felt that one partner should bind the other, and [he] thought that the overall [March 1980] contract should surely tie in Mr. Strope as much as necessary." He further testified that the note was not given in payment of the advances he had made to the partnership, but to "establish the fact that the partnership still owed [him] money." McKee made several payments on the note; however, there remains an unpaid balance of $25,203.94.

On May 20, 1980, Strope resigned from the Strope-McKee partnership.[1] On May 27, Strope and McKee executed an employment agreement that Strope would continue to work on the farm as a farm manager, with McKee as his employer. At trial, Strope testified that he resigned as partner because he did not have the financial investment ability that the partnership needed. In August 1980, Strope transferred his vendee's interest in the contract for deed for the 2111 acres to McKee, and McKee then transferred the interest to Golden Valley Farms, a partnership consisting of McKee and two other investors.

Strope testified he informed Gjovik about his resignation from the partnership at about the same time the resignation occurred in May. Gjovik, however, testified that his first awareness of the resignation came in August and then only "through the grapevine." He said neither Strope nor McKee directly informed him of the change, that McKee "didn't talk about it very much," only "very vaguely." Gjovik said the only change he really noticed was that he had been dealing primarily with

1. Strope-McKee's 1980 U.S. Partnership Return of Income statement, however, indicates Strope's interest continued throughout 1980; the 1981 tax return shows his interest terminated on January 2, 1981. The trial court's findings did not address this factual discrepancy.

Strope from the time negotiations for the sale first began in 1979 and through the first part of 1980 and then began dealing more and more with McKee. He also testified that he had discussions with Strope about the parties' business dealings as late as 1982. Gjovik testified that although he was finally aware of Strope's resignation from Strope-McKee, he was never informed or led to believe that McKee assumed Strope's liabilities under the partnership, and he always assumed that Strope's obligations under the March 1980 contract were unaffected by the resignation.

When the May 1981 installment on the Thorp loan came due, McKee advised Gjovik that he was not able to make the payment. To raise the money, McKee determined to sell the farm machinery at an auction. The auction was held on July 15, 1981, and the proceeds were sent to Thorp, thereby reducing that debt to $219,000.

However, because the bulk of the machinery securing the loan with Thorp had been sold at the auction, Thorp notified Gjovik in September 1981 that its loan was undersecured. Thorp asked Gjovik to grant it a mortgage on his later acquired farm homestead as well as a security interest in some of the remaining farm equipment.[2] McKee told Gjovik that if he would give Thorp the additional collateral and forestall foreclosure, McKee would sell some of the acreage and use the proceeds to pay the debt. Gjovik agreed, and on November 30, 1981 he gave Thorp the requested security. In return, Thorp lent Gjovik $287,600, of which $219,000 was used to pay off the original debt and the balance was used to pay off the existing mortgages on Gjovik's homestead.

The first payment on the new Thorp loan came due in March 1982. When Gjovik contacted McKee about the payment, McKee told him he had not been able to sell any of the land. Gjovik also contacted Strope, who "expressed grief" about the

situation but told him to talk to McKee about it. The debt remained unpaid; in the summer of 1982 Thorp repossessed all of the collateral and sold it at an auction. Thorp also foreclosed on the mortgage on Gjovik's homestead; the property was sold at a sheriff's sale in May 1983.

The two pieces of leased equipment were also sold at the auction. The sale price of one of the pieces was sufficient to pay off that lease; the other piece, however, sold at a loss. IFG Leasing later got a deficiency judgment against Gjovik for the $18,907.39 unpaid balance on the lease.

In 1983, Gjovik brought this action against Strope and McKee. He asked for satisfaction of the $25,203.94 balance on the promissory note, recovery of the $219,000 balance on the original Thorp loan, and payment of the $18,907.39 deficiency judgment owed to IFG Leasing, for damages totaling $263,111.33. McKee answered the complaint pro se and did not participate in the trial. The court found McKee to be in default and proceeded without him.

The trial court found Gjovik accepted the promissory note from McKee "in satisfaction of the advances Plaintiff Gjovik had made for expenses and payments to Thorp Loan during the year 1980 together with cash payments Defendant McKee had made to Plaintiff Gjovik in part payment of such advances." The court further found that Strope's contractual obligations to Gjovik were terminated and satisfied by the subsequent agreements between Gjovik and McKee, with Gjovik "recognizing Defendant Strope's withdrawal from the partnership and acceptance of McKee's assumption of all obligations under the contracts between the parties." The court accordingly entered judgment dismissing the complaint against Strope and entered judgment against McKee in the full amount of $263,111.33 plus $8717.11 in accrued interest.

2. Gjovik had since assigned his vendor's interest in the Strope and McKee contract for deed to Robert and Gertrude Carter. In exchange, the Carters conveyed to him the farm homestead,

and cash. In August 1982 the Carters cancelled the Strope-McKee contract for deed for nonpayment.

## ISSUES

1. Is the March 1980 agreement binding on Strope although he did not sign the assumption of liabilities agreement?

2. Did the trial court err in finding that Strope's liability to Gjovik was terminated by the subsequent agreements between Gjovik and McKee?

## ANALYSIS

■ 1. Before the trial court, Strope based his claim that he has no remaining liability to Gjovik on his failure to sign the assumption of liabilities agreement. The trial court, however, properly treated Strope's obligation under the March 1980 agreement as enforceable. Strope executed the two primary documents that formed the basis of the agreement, and the contract included an agreement to assume certain liabilities, regardless of a separate agreement. The requirement in the contract that the assumption of liabilities agreement contain terms "acceptable to Strope-McKee" was met by McKee's execution of that subsequent agreement. See Minn.Stat. § 323.08 (1984) (every partner is an agent of the partnership for the purpose of its business).

Moreover, Strope himself testified that the making of an "acceptable agreement" was dependent only upon the accountant's assessment of the precise values of the assets and liabilities and of the interest amounts involved, and not on any details that had to be worked out with Gjovik or with any of the creditors listed in the agreement. Finally, it is also clear that all three parties relied upon the contract in performing under the contract. Strope acknowledged that he and McKee signed the contract for deed for the 2111 acres, had taken possession of all 2311 acres and the farm equipment, and had farmed the land with the aid of the equipment. He also acknowledged that Gjovik had made cash advances to the partnership in an attempt to help them meet their obligations under both the main contract and the loans assumed as part of the contract.

2. Also, Strope rests on the trial court finding that his obligations were terminated. A trial court's findings will be set aside if they are clearly erroneous. Minn. R.Civ.P. 52.01.

Appellant alleges error in the trial court's findings that McKee agreed to assume the existing obligations of the partnership upon Strope's resignation and that Gjovik knew of that agreement. The trial court's conclusion that the subsequent agreements between Gjovik and McKee relieved Strope of his obligations to Gjovik is dependent upon these findings. See Minn. Stat. § 323.35 (1984).

■ A partner is discharged from any existing liability upon dissolution of the partnership by express contract between that partner, the person continuing the business, and the partnership creditor, or by the inference of such a contract from the course of dealing between the creditor having knowledge of the dissolution and the person continuing the business. Minn. Stat. § 323.35 (1984). In addition, a partner is discharged if: (1) the person continuing the business agrees to assume the existing obligations of the partnership; (2) the creditor knows of that agreement; and (3) the creditor consents to a material alteration in the nature or time of payment of the obligation. Id.

■ The trial court made no finding of an express contract or of inferences of a contract, nor does the evidence suggest one. Thus, the critical issue is whether the evidence sustains the trial court's conclusion that "Strope's contractual obligations owing [Gjovik] were terminated and satisfied by the subsequent agreements between [Gjovik] and [McKee], [Gjovik] recognizing [Strope's] withdrawal from the partnership and acceptance of McKee's assumption of all obligations under the contracts between the parties."

Scant evidence supports the premise that McKee agreed to assume the existing obligations of the partnership. The trial court found that Strope and McKee "settled all accounts between them by separate agree-

ment." The letters written between Strope and McKee with regard to Strope's resignation, however, do not mention any assumption of liabilities by McKee, and Strope did not testify that he and McKee had so agreed. Indeed, Strope's defense at trial did not include any assertion that McKee had assumed his liabilities upon dissolution of the partnership. Rather, he focused solely on his claim that he was never bound by the March 1980 agreement, a claim properly rejected by the trial court. We are mindful of the clear language of the statute that

> [t]he dissolution of the partnership does not of itself discharge the existing liability of any partner.

*Id.* Only Strope's conveyance of his interest in the contract for deed to McKee indicates McKee might have assumed Strope's obligations.

More importantly, the statute also requires that the creditor know of any agreement to assume the partnership's existing obligations. Gjovik was aware that Strope and McKee were having financial difficulties. He also learned of Strope's resignation from the partnership. He was not, however, privy to the partners' resolution of their respective responsibilities for the partnership's liabilities following Strope's resignation. No evidence suggests that Gjovik had knowledge of any such agreement. Gjovik was given remarkably little information about the partnership; it is telling in this regard that even the original sale contract speaks of purchase by both Strope and McKee, without mention of a partnership. Gjovik testified that it never occurred to him that Strope would not continue to be liable under the March 1980 contract; his actions subsequent to Strope's resignation are consistent with his testimony. Strope produced no evidence to refute Gjovik's testimony.

Finally, there is some evidence that Gjovik consented to a material alteration in the nature or time of payment of the partnership's obligations. For example, McKee's July 1981 promissory note permitted the debtors to pay Gjovik back in October 1981,

several months later than their original oral agreement to pay back half in the fall of 1980 and half in the spring of 1981. Gjovik's assent to the sale at auction of the machinery also affected the nature of the obligation, given that the machinery was collateral for Gjovik's debt with Thorp and that Strope-McKee assumed that debt. A third modification occurred when Gjovik mortgaged his homestead and gave Thorp Credit additional machinery as security for its loan of $287,600. Gjovik's action provided relief from the partnership's obligation to assume all responsibility for the original loan from Thorp.

However, because discharge without an express or implied contract occurs only if all three elements of the alternative statutory test are present, we need not determine whether these subsequent agreements constituted "material alterations" in the nature or time of payment of the partnership's obligations. The lack of evidence that McKee agreed to assume Strope's obligations or that Gjovik was aware of any such purported agreement is dispositive; Strope's liability to Gjovik was not discharged.

## DECISION

The evidence does not sustain the findings that defendant McKee agreed to assume the existing obligations of his partnership with respondent Strope or that appellant Gjovik knew of any such agreement. Therefore, respondent was not discharged from his liability to appellant and he and McKee are jointly and severally liable to appellant for $263,111.33 plus accrued interest. Judgment to be entered accordingly.

Reversed.