Grant GJOVIK, Respondent,

v.

Lawrence STROPE,
Petitioner, Appellant,

Lawrence McKee, Respondent,

Martin Gubb, et al., Defendants.

No. C4–86–371.

Supreme Court of Minnesota.

March 6, 1987.

Kurt J. Marben, Thief River Falls, for respondent Grant Gjovik.

Robert J. Schmitz, Mark E. O'Boyle, Crookston, for appellant Lawrence Strope.

YETKA, Justice.

Respondent Grant Gjovik brought an action to collect on loans made to the partnership of Lawrence McKee and petitioner Lawrence Strope. The trial court found that McKee had assumed all the obligations of the partnership and that Strope had been discharged from partnership liabilities. The trial court entered judgment against McKee and dismissed the action against Strope. The court of appeals reversed the judgment for Strope, finding him still liable for partnership debts. Strope appeals this decision. We reverse and reinstate the trial court's decision.

In 1977, Grant Gjovik purchased 2,111 acres of land in Roseau County, Minnesota, known as the Diamond H Ranch. In October 1978, Gjovik leased a Steiger tractor, a Massey-Ferguson combine, and a grain handling system from IFG Leasing, Inc.

Each of these leases required Gjovik to make lease payments every October. In July 1979, Gjovik borrowed $340,000 from Thorp Credit, Inc., so as to purchase 200 other acres of farmland and refinance the debt on his farm equipment. As collateral for the loan from Thorp, Gjovik gave them a mortgage in the 200 acres of land purchased and also granted a security in certain farm machinery. The Thorp loan was to be repaid in four annual installments of $91,162 due each May beginning in 1980.

In the fall of 1979, Gjovik talked with Lawrence Strope and Lawrence McKee, who had formed a partnership for the purpose of investing in land in northwestern Minnesota. Originally, Strope and McKee were interested only in purchasing Gjovik's 2,311 acres of land, but then inquired about purchasing Gjovik's farm equipment also. A contract was drawn up on March 1 to sell Gjovik's farm and farm machinery to Strope and McKee for $2,227,900 and the assumption of Gjovik's debts. The contract expressly provided for the execution of two subsequent agreements: a contract of deed for 2,111 acres of land and an assumption of liabilities agreement designed to transfer Gjovik's obligations as purchaser of the Diamond H Ranch, his debt with Thorp and his obligation under the lease contracts with IFG. The details of this second agreement were left unstated until Strope and McKee's accountant, Norm Hayes, could work out the details. The contract for deed was signed by all parties on March 17, 1980. However, only Gjovik and McKee signed the assumption of liabilities.

Immediately following the March 1 sale, Gjovik was hired to manage operations on the Diamond H Ranch. From March until May, Strope supervised operations on the farm for the partnership, visiting it approximately once a month. By May, the partnership needed money to meet its debts. Strope had little money of his own, his intended role being that of a source of farm management expertise. McKee, who was to have supplied required capital, had suffered financial losses in connection with McKee's brokerage business in Boston.

Because of its financial needs, the partnership could no longer afford a non-contributing partner and, thus, Strope resigned. Strope's resignation, effective May 20, was contained in a May 19 letter to McKee. Later, McKee acquired two new partners, Martin and Queenie Gubb. Strope continued to supervise operations of the farm on monthly visits through August 1980, drawing a salary as a manager. Strope testified he informed Gjovik of his withdrawal in May. Gjovik only recalls hearing of Strope's withdrawal indirectly from McKee in August. After discussing the matter with Norm Hayes, Gjovik's accountant, Strope chose not to sign the assumption of liabilities agreement contained in the March contract. After August, McKee supervised operations at the farm instead of Strope.

The partnership lacked funds in May 1980 to make the payment due to Thorp. Gjovik agreed to lend the money required as well as $12,700 more needed for daily operations. The checks were made payable to Strope and McKee and deposited in a partnership account, one to which Strope retained rights of withdrawal. Gjovik discussed repayment of these loans with Strope in the early summer of 1980 and with McKee after August. Gjovik's understanding was that half of the loan would be paid in the fall and the other half in the spring. Gjovik received partial payment of the loans in the fall of 1980. On July 15, 1981, McKee signed a promissory note to Gjovik for $83,207, the balance remaining on Gjovik's loans. Strope was not contacted with regard to this note and knew nothing about it. McKee made several further payments on this note, but left a balance of $25,203.94 still owing.

In May of 1981, the second payment on the debt to Thorp came due. McKee advised Gjovik that the money was not available, and the two decided to auction off some farm machinery to raise money. The sale occurred on July 15, 1981, and the proceeds reduced the debt to Thorp to $219,000. Strope received no notice of the sale.

Most of the equipment sold at auction was security for the loan to Thorp. Thorp notified Gjovik in September 1981 that the loan was now under-secured. Thorp asked Gjovik for a mortgage in an 80–acre homestead Gjovik had acquired with the proceeds from the sale of the farm. Gjovik contacted McKee, who told him that if Gjovik agreed to give Thorp the additional security, McKee would be able to sell the farmland and pay the debt to Thorp.

On November 30, 1981, Gjovik gave Thorp the additional security requested. Thorp then loaned Gjovik and McKee $287,600, of which $219,000 was used to pay off the original debt to Thorp and the remaining to release the existing mortgage on Gjovik's homestead. McKee signed the new note as an individual. Gjovik, McKee and the Gubbs all signed the new mortgage covering Gjovik's land. Strope was not consulted or otherwise involved with the renegotiation of the loan.

The first payment on the new Thorp loan was due March 1982. Gjovik contacted both McKee, who was unable to come up with money for payment, and Strope, who expressed grief and told him to call McKee. As a result of the missed payment, Thorp repossessed Gjovik's vehicles and equipment in 1982 and foreclosed and eventually sold Gjovik's homestead in 1983. The tractor leased from IFG was sold at auction in 1982 and the proceeds remitted to IFG, leaving $18,907.39 still due.

In 1983, Gjovik commenced this action against both Strope and McKee, seeking $25,203.94 as the balance owing on the promissory note signed by McKee; the $219,000 remaining on the Thorp loan and $18,907.39 for the deficiency judgment owed to IFG Leasing. The total sought was $263,111.33. McKee answered the complaint *pro se* and did not participate in the trial.

The issues on appeal are as follows:

I. Did the course of dealing between Gjovik and McKee imply Gjovik's agreement to discharge Strope from Strope's liability for partnership debts?

II. Did Gjovik know of an agreement to transfer partnership obligations from McKee to Strope at the time he consented to alteration of the nature of those obligations?

Petitioner Strope wishes to escape liability for debts incurred by a partnership from which he resigned. The circumstances under which this is possible are set forth in Minn.Stat. § 323.35 (1986):

The dissolution of the partnership does not of itself discharge the existing liability of any partner.

A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between that partner, the partnership creditor and the person or partnership continuing the business; and such agreement may be inferred from the course of dealing between the creditor having knowledge of the dissolution and the person or partnership continuing the business.

Where a person agrees to assume the existing obligations of a dissolved partnership, the partners whose obligations have been assumed shall be discharged from any liability to any creditor of the partnership who, knowing of the agreement, consents to a material alteration in the nature or time of payment of such obligations.

Strope's initial claim is that the course of dealing between Gjovik and McKee after Strope's withdrawal from the partnership implies an agreement by Gjovik to release Strope from his obligations. To make this claim, Strope must first establish that there was an agreement that he be released from liability. The relevant findings of fact by the trial court are "[t]hat Lawrence Strope resigned from the partnership of McKee and Strope on May 20, 1980 and thereafter the partners settled all accounts between them by a separate written agreement" (Trial Ct. Finding 4) and "[t]hat Defendant Lawrence Strope's contractual obligations owing Plaintiff Grant Gjovik were terminated and satisfied by the subsequent agreements between Plaintiff and Defendant McKee, Plaintiff Gjovik recognizing Defendant Strope's withdrawal from the partnership and acceptance of McKee's assumption of all obligations under the contracts between the parties." (Trial Ct. Finding 13)

The standard of review of factual findings made by a trial court is set forth in Minn.R.Civ.P. 52.01: "Finding of fact shall not be set aside unless clearly erroneous * * *." Therefore, a trial court's finding of fact will be reversed only if, upon review of the entire evidence, a reviewing court is left with the definite and firm conviction that a mistake has been made. *City of Minnetonka v. Carlson*, 298 N.W.2d 763, 766 (Minn.1980). In this case, the court of appeals disagreed with the trial court, finding "scant evidence" that McKee had assumed the partnership obligations and no evidence that Gjovik accepted any such agreement. *Gjovik v. Strope*, 392 N.W.2d 351 (Minn.App.1986). Strope's testimony at trial is that the details of his resignation were worked out in correspondence with McKee and that he eventually assigned his interest in the Diamond H to McKee while accepting the partnership's interest in another unrelated tract of land. The letter Strope addressed to McKee states only that he resigned from the partnership, and the reply from McKee adds nothing more. However, though there is little direct evidence of an agreement by McKee to assume partnership debts, Strope did assign all his partnership interests to McKee, which seems to imply an intent to cast off partnership obligations as well. McKee's subsequent failure to turn to Strope for more money when the partnership needed funds also indicates that McKee did not consider Strope liable. Thus, the trial court's finding that there was an agreement to that effect is amply supported by the evidence.

Given that the agreement between Strope and McKee existed, the crucial question then becomes whether Gjovik also agreed that Strope would be released from partnership debts. Though section 323.35 indicates that such an agreement

may be inferred from the course of dealing between the creditor, Gjovik, and the remaining partner, McKee, the statute does not state what specific factors are to be considered, and there is no Minnesota precedent to supply the lack. However, we deem it unnecessary to discuss the matter in detail because, under the unique facts of this case, the trial court had ample evidence for its finding that Gjovik knew of Strope's withdrawal from the partnership with McKee and looked solely to McKee and to his new partners for payment. The court of appeals should not substitute its findings for that of the trial court merely because it feels that the case was wrongly decided. Respect must be paid to the applicable standard of review. Here, there is not only adequate evidence, but overwhelming evidence to support the trial court's findings. Strope made it clear he had withdrawn from the partnership with McKee within 3 months of its formation. Gjovik admitted that he knew by August 1980 of the withdrawal, and the trial court found that he knew as early as July. Gjovik also knew in 1980 that Strope never signed the assumption of liabilities agreement, which Gjovik and McKee had both executed. Clearly, if Gjovik intended to look to Strope for payment, he would have insisted on Strope's signature on that document.

There is more. In May of 1981, Gjovik and McKee agreed to sell off some of the machinery to reduce the loan balance owed Thorp. Neither of them conferred with Strope, who was not even aware of the refinancing until later. In November 1981, Thorp refinanced the debt by loaning Gjovik and McKee $287,600, of which $219,000 was used to pay off the original debt to Thorp remaining after the machinery sale. The new note to Thorp was executed by Gjovik and McKee. At the same time, Gjovik gave Thorp additional security on its loan in the form of a mortgage on land owned by Gjovik. The mortgage was signed by Gjovik, McKee and the Gubbs. Again, Strope was not contacted or even aware of the refinancing. This course of dealing clearly demonstrates Gjovik's ac-

ceptance of McKee as the party responsible for the partnership debt.

Accordingly, the court of appeals is reversed and the decision of the trial court is sustained. The case is remanded to the trial court for the entry of judgment in conformity with this opinion.