AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL # 14, Appellant,

v.

CITY OF ST. PAUL, Respondent.

No. C3–94–2223.

Court of Appeals of Minnesota.

June 27, 1995.

Gregg M. Corwin, St. Louis Park, for appellant.

Timothy E. Marx, St. Paul City Atty., Terry Sullivan, Asst. City Atty., St. Paul, for respondent.

Considered and decided by KALITOWSKI, P.J., TOUSSAINT, C.J., and FOLEY,* J.

## OPINION

TOUSSAINT, Chief Judge.

Appellant American Federation of State, County, and Municipal Employees, Council 14 (AFSCME) sued respondent City of St. Paul (the City), alleging that the City engaged in unfair labor practices in violation of the Public Employment Labor Relations Act (PELRA), Minn.Stat. §§ 179A.01–25 (1992). The trial court entered judgment for respondent, finding no violation of PELRA. AFSCME appeals from the judgment and

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

the trial court's denial of its motions for a new trial or amended findings.. We affirm.

## FACTS

AFSCME Council 14 is the exclusive representative of certain technical and clerical employees of City of St. Paul. In the latter part of 1993, AFSCME and the City were involved in negotiations over successor agreements to each of the 1992–93 collective bargaining agreements governing the terms and conditions of employment for AFSCME's members. The negotiating teams for AFSCME and the City each had full authority to reach a tentative agreement on all bargaining issues.

When negotiations began, James Scheibel was the City's mayor. Mayor Scheibel instructed his negotiators that he wanted the City to be at or under the settlement agreement reached between the State of Minnesota and its employees with regard to wages. The record does not reveal the terms of this contract. The 1994 budget which Mayor Scheibel proposed to the City provided for no wage increase for employees.

During negotiations, the City was aware of the costs and rising unfunded liability it was incurring by providing health insurance benefits to retirees. The City's initial proposal to each AFSCME unit on October 25, 1993, contained a provision for revision of the various eligibility requirements for employee insurance. AFSCME rejected the City's initial proposals, and wanted to retain the provisions from the 1992–93 agreements. The City continued to present proposals to AFSCME to change retiree health insurance benefits, but AFSCME rejected all such proposals.

In November 1993, Norman Coleman was elected mayor of the City. The election and change of administration did not postpone the negotiations between AFSCME and the City.

For several years, the City had retained an independent consultant, Advanced Risk Management Techniques, Inc. (ARM–Tech) to periodically analyze the cost to the City of providing retiree health insurance benefits to its employees. By letter dated November 23, 1993, ARM–Tech provided the City with a sequel to its 1986 analysis. That projected the City's cost of providing health insurance benefits for retirees into the future. The City had ARM–Tech's information in hand when it was bargaining with AFSCME.

On December 20, 1993, the parties reached tentative agreements on the collective bargaining agreements for each of the local unions. In each of these agreements, AFSCME agreed to accept no wage increase for 1994, and also agreed to only a 2% cost of living increase on January 1, 1995, and a ½% cost of living increase on July 1, 1995. AFSCME agreed to these provisions in order to preserve the language regarding health insurance benefits contained in each of the local unions' 1992–93 collective bargaining agreements.

Mayor Scheibel discussed the terms of these agreements with the City's labor relations team, who informed the mayor that they did not think they could do any better if they went back to the bargaining table. The City was aware that the tentative agreements did not effect any change to retiree health insurance issue in favor of a better wage package.

The City subsequently prepared final copies of each tentative agreement for the local unions represented by AFSCME. These agreements incorporated the provisions regarding retiree health insurance benefits that were contained in each local union's 1992–93 collective bargaining agreement. On December 28, 1993, each AFSCME local union ratified its respective agreement.

Norman Coleman took office in early 1994. On January 31, 1994, Mayor Coleman discussed the tentative agreements with his labor relations team. It was the consensus of the City's team that the tentative agreements with AFSCME were the best that could be put forward to the City Council. Mayor Coleman directed his team to move forward with the proposed agreements.

In early February 1994, Mayor Coleman approved requests to submit the tentative contracts for consideration to the City Council. In late February 1994, ARM–Tech supplied the City with another analysis of the

cost incurred by the City for retiree health insurance benefits. This analysis contained more detailed information for the City because it broke down costs per hour for each bargaining unit and provided specific strategies for reduction of future liability.

On March 9, 1994, the tentative agreements were presented to the City Council. The city council voted to ratify both tentative agreements. Mayor Coleman did not become aware of the ARM–Tech reports until March 15, 1994. On March 16, Mayor Coleman provided a memorandum to the City Council expressing his concern over funding the retiree health insurance benefits provided by the tentative agreements. Mayor Coleman indicated that if the City Council did not reconsider its previous resolution approving the agreements, he would veto it. On March 16, the City Council unanimously voted to reconsider its previous ratification of the tentative agreements.

AFSCME sought and obtained a temporary restraining order enjoining the City from taking any further action in regard to its reconsideration of the tentative agreements on April 4, 1994. The matter was tried to the court. The trial court determined that the City had neither violated Minn.Stat. § 179A.20, subd. 5 (1992) (relating to implementation of executed contracts), nor committed an unfair labor practice in violation of Minn.Stat. § 179A.13, subd. 2(5) (refusing to meet and negotiate in good faith). AFSCME appeals the denial of the motion for new trial or amended findings.

## ISSUES

1. Did the trial court err in concluding that the City did not violate Minn.Stat. § 179A.20 subd. 5?

2. Did the trial court err in concluding the City had not failed to negotiate in good faith?

## ANALYSIS

■■■ This case involves the application of the Public Employment Labor Relations Act (PELRA), Minn.Stat. §§ 179A.01—179A.25, to the facts as found by the trial court. The

trial court's findings of fact will not be set aside unless clearly erroneous. Minn. R.Civ.P. 52.01.

> [T]his court will only reverse a trial court's findings of fact if, upon review of the entire evidence, we are "left with the definite and firm conviction that a mistake has been made"

*In re Guardianship of Dawson,* 502 N.W.2d 65, 68 (Minn.App.1993) (quoting *Gjovik v. Strope,* 401 N.W.2d 664, 667 (Minn.1987)), *pet. for rev. denied* (Minn. Aug. 16, 1993). But, the trial court's construction of a statute is a question of law and thus is fully reviewable by this court. *Hibbing Educ. Assn. v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985). Similarly, the construction and effect of a contract is also a question of law and thus is fully reviewable. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979).

■■■ 1. PELRA requires public employers and the employees' exclusive representative to execute a written contract containing the terms of any negotiated agreement. Minn.Stat. § 179A.20, subd. 1 (1992). The act further provides:

> Upon execution of the contract, the employer shall implement it in the form of an ordinance or resolution. If implementation of the contract requires adoption of a law, ordinance, or charter amendment, the employer shall make every reasonable effort to propose and secure the enactment of this law, ordinance, resolution, or charter amendment.

*Id.,* subd. 5 (1992).

Here, the trial court concluded that subdivision 5 did not apply because there was no executed contract between AFSCME and the City. In making this determination, the court relied in part on Article 30.4 of the tentative agreement, which stated:

> This constitutes a tentative agreement between the parties which will be recommended by the City Negotiator, but is subject to the approval of the Administration of the City and the City Council and is also subject to ratification by the Union.[1]

---

1. Article 30.4 is contained in the tentative agreement with local 1842. The tentative agreement

The trial court found this provision to be a condition precedent to a formal and binding contract. Because the approval of the City Council and Administration was not obtained, the trial court concluded the contracts were not "executed" by those authorized to enter into a binding agreement on behalf of the City.

AFSCME argues this conclusion was erroneous, and contends that the contracts were executed when the tentative agreements were signed by the city negotiator. AFSCME further claims that because the city negotiator had the full authority of the mayor to negotiate and execute the contracts on behalf of the mayor, the negotiator's signature bound the City to the agreements. We disagree.

 The test of whether a contract has been formed is an objective one, to be judged by the words and actions of the parties and not by their subjective mental intent. *Hill v. Okay Const.,* 312 Minn. 324, 332, 252 N.W.2d 107, 114 (1977). There can be no contract where the parties' actions indicate an expectation "that something remains to be done to establish contractual relations." *A.E. Staley Mfg. Co. v. Northern Coops.,* 168 F.2d 892, 895 (8th Cir.1948); *see also Linne v. Ronkainen,* 228 Minn. 316, 320, 37 N.W.2d 237, 239 (1949) ("The law does not * * * regard an arrangement as completed which the parties thereto regard as incomplete.") (quoting 12 Am.Jur., *Contracts,* § 23).

Here, the words and actions of both parties indicate that the tentative agreements were exactly that: preliminary agreements subject to final approval by the parties. The plain language of each document explicitly states that the agreement would only become binding after the occurrence of two events: (1) AFSCME's membership's approval of the agreement; and (2) the City Council's approval of the agreement. In fact, both parties submitted the agreements for approval. In other words, the terms of the documents and the actions of the parties indicate that all parties contemplated that the agreements

could be approved *or* rejected by either side.[2] The record is clear that all parties expected that something remained to be done after the tentative agreements had been drafted before contractual relations could be established. *See A.E. Staley Mfg. Co.,* 168 F.2d at 895. Because the City Council did not approve the tentative agreements, the agreements did not become executed contracts, and the trial court did not err in concluding that Minn.Stat. § 179A.20, subd. 5 was inapplicable.

█ 2. PELRA provides that a public employer commits an unfair labor practice when the employer refuses "to meet and negotiate in good faith with the exclusive representative of its employees." Minn.Stat. § 179A.13, subd. 2(5) (1992). AFSCME argues the City breached its duty to bargain in good faith by shifting its bargaining position from containing wages to reducing retiree health insurance benefits. AFSCME also argues the City was attempting to prolong negotiations to avoid reaching any agreement. In particular, AFSCME believes they are being penalized because of AFSCME's endorsement of Coleman's opponent in the mayoral race.

The trial court disagreed, and found that Mayor Coleman wanted the agreements to be reconsidered due to the high cost of retiree health insurance. The court determined that the evidence did not support AFSCME's contention that this reason was specious or pretextual. The trial court specifically found that Mayor Coleman was not aware of the contents of the ARM–Tech reports prior to March 15, 1994. The court concluded these reports provided a reasonable basis for Coleman's concerns, and that the evidence did not show that Coleman's refusal to approve the tentative agreements was an effort to string out negotiations. After reviewing the record, and recognizing that the trial court is in the best position to judge the credibility of the witnesses and evaluate the evidence, we cannot say the trial court's findings are clearly

with local 2508 contained a similar term.

2. Under AFSCME's analysis, ratification by the union membership would be superfluous. If the union members had been the ones to reject the

tentative agreements, we doubt that AFSCME would argue the agreements were nevertheless executed, legally binding contracts.

erroneous. *See* Minn.R.Civ.P. 52.01. This is not a situation where we can say we have a "definite and firm conviction that a mistake has been made." *Gjovik,* 401 N.W.2d at 667.

## DECISION

Because the tentative agreements between AFSCME and the City were not executed contracts, Minn.Stat. § 179A.20, subd. 5 is inapplicable. The trial court's findings support its conclusion that the City did not refuse to negotiate in good faith.

**Affirmed.**