**STATE of Minnesota, Respondent,**

v.

**Burhan Mohammed FARRAH, Appellant.**

No. A05–1277.

Supreme Court of Minnesota.

July 19, 2007.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Appellant Burhan Mohammed Farrah was convicted of felony fourth-degree criminal sexual conduct following a jury trial in Hennepin County. On appeal, the court of appeals affirmed, rejecting Farrah's claim of reversible error in the admission at trial of his recorded statement to police. *State v. Farrah*, No. A05–1277, 2006 WL 2473655, at *1 (Minn.App. Aug.29, 2006). Concluding that the state did not establish that Farrah, a limited English-speaker, made a valid waiver of his *Miranda* rights and that the admission of the statement was not harmless, we reverse and remand for a new trial.

On November 20, 2003, Plymouth police responded to a 911 report of a sexual assault in progress or of recent occurrence in the parking lot of an apartment complex on Harbor Lane. Officer Robert Topp arrived within less than a minute, entered the parking lot in his marked squad car, saw a male matching the description given in an updated dispatch, and drove toward him. The male, later identified as Farrah, turned around and put his hands up in the air. He had a 24–ounce can of malt liquor in his jacket pocket and appeared intoxicated. The officer removed the can, handcuffed Farrah, and placed him in the back of the squad car. Farrah asked the officer "what this was all about," and the officer asked Farrah if he "had any idea what this was about." Farrah replied that "the female" told him "she was 20."

Meanwhile, Officer Kevin Wilson, who arrived shortly after Officer Topp, located the complainant, C.B., who was 14 years old and developmentally disabled. She

told the officer that she had left her apartment to take some trash to the dumpster, and as she was walking through the parking lot, a car pulled in and almost struck her. After parking the car, the driver got out and apologized. As C.B. started back toward the apartment building, the driver approached, grabbed her arm, pulled her into the backseat of his car, locked the doors, and laid on top of her, kissing her neck and face and touching her intimate parts over the clothing. After "some time of this," she was able to push him off, unlock the door, and run to the apartment building entrance where she encountered a neighbor and asked her to call 911. C.B. described her assailant and said he was carrying a beer can. Officer Wilson escorted C.B. to her apartment and taped her statement.

Officer Topp transported Farrah to the Plymouth Police Department and placed him in the interview room for questioning. Farrah, who emigrated from Somalia in 1999, spoke with a "strong" accent. The officer began the interrogation by confirming Farrah's identification, date of birth, and residence. The officer asked Farrah about his alcohol consumption, and Farrah said he had "five beers," the "tall ones." The officer read Farrah his *Miranda* rights from a department-issued card and asked if he understood "all that?" Farrah responded, "Little I'm not (inaudible) speak very good English." The officer, who tended to speak somewhat rapidly, offered to read the advisory more slowly, and then started to repeat the advisory at about the same pace. Farrah interrupted, wanting to "know what happened." The officer told Farrah, "before I can talk to you, you need to understand these."

The officer then repeated the advisory, after which the following exchange occurred:

Q: Do you understand your rights?

A: Okay. Little, yeah.

Q: What don't you understand cause I need to explain before I can even ask you any questions.

A: Well, you ask me . . .

Q: If you want a lawyer?

A: Pick the lawyer.

Q: Right.

A: That's what (inaudible).

Q: If you want a lawyer you can have them here before I even talk to you or you can contact them . . .

A: Okay I think I will talk to lawyer, (inaudible).

Q. What's that?

The officer then went back over the right-to-counsel portion of the *Miranda* advisory:

A: Like even if I have a lawyer . . .

Q: Then they will give you one for free. In other words you don't have to talk to me right now, although I would like to, to find out what happened.

A: Okay.

Q: But you don't have to you can talk to a lawyer first if that is what you want to do?

A: Okay.

Q: So do you understand that?

A: Yeah.

Q: Okay having your rights in mind do you want to talk to me now?

A: Yeah go ahead.

Q: Okay you don't want to talk to a lawyer first?

A: No I don't want to.

Farrah then gave a statement in which he made incriminating remarks.[1]

---

1. Farrah admitted talking to an 18– or 20– year–old girl in his car and said that they had

Farrah was charged by complaint with fourth-degree criminal sexual conduct in violation of Minn.Stat. § 609.345, subd. 1(b) (2002). In April 2004, the criminal proceedings were suspended because of a district court finding that Farrah was incompetent due to schizophrenia. Upon Farrah's restoration to competency through treatment, the criminal proceedings resumed in September 2004. The state later amended the complaint to add charges of kidnapping and false imprisonment.

A Somali interpreter was appointed for Farrah at trial. Farrah moved to suppress the statement he made in the squad car as well as the recorded statement made in the police department interview room on the ground that both statements had been obtained in violation of his constitutional rights. The district court granted the motion to suppress the first statement[2] but denied the motion to suppress the second statement, which was subsequently played for the jury. The state also presented the testimony of C.B. and the neighbor who made the 911 call. The state was permitted, over objection, to present statements C.B. made to the neighbor, Officer Wilson, C.B.'s grandmother, and C.B.'s best friend. After Farrah exercised his right not to testify, his cousin testified about their family's adher-

ence to certain social customs. The jury found Farrah guilty of fourth-degree criminal sexual conduct and not guilty of the remaining offenses. The court entered judgment on the conviction and imposed the presumptive guidelines sentence of a year and a day, execution stayed, with conditions of probation to include 120 days in the county workhouse. The court of appeals affirmed, and we granted further review. Farrah claims reversible error in the admission of his recorded statement to police and the complainant's out-of-court statements.

## I.

The Fifth Amendment to the U.S. Constitution and Article I, Section 7 of the Minnesota Constitution protect persons from compelled self-incrimination.[3] Because of the coercion inherent in custodial interrogation, a criminal suspect must be

> warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[4]

---

a boyfriend/girlfriend conversation, although he denied any physical contact. When asked what the girl might say happened in the car, Farrah said, "(inaudible) rubbed her."

**2.** *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (stating that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (footnote omitted)).

**3.** "[N]or shall [any person] be compelled in any criminal case to be witness against himself," U.S. Const. amend. V; Minn. Const. art. I, § 7 (employing similar language).

**4.** The *Miranda* advisory need not take a rigid form so long as it conveys to the suspect (1) that he has the right to remain silent, (2) that anything he says can be used against him in court, (3) that he has the right to a lawyer, (4) that he has the right to have the lawyer present during interrogation, and (5) that a lawyer will be appointed at no cost if he cannot afford one. *See California v. Prysock*, 453 U.S. 355, 359–61, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981).

■ The defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." Id. at 444, 86 S.Ct. 1602. The prosecution has the burden of proving a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (internal quotation marks omitted) (stating that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"). Factors commonly considered include age, intelligence and education, familiarity with the criminal justice system, physical and mental condition, and language barriers. *State v. Camacho*, 561 N.W.2d 160, 168 (Minn.1997). Findings of fact surrounding a claimed *Miranda* waiver are reviewed for clear error; legal conclusions based on those facts are reviewed de novo. *See State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978) citing *Brewer v. Williams*, 430 U.S. 387, 403, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (stating that "the question of waiver [is] not a question of historical fact, but one which * * * requires application of consti-tutional principles to the facts as found" (internal quotation marks omitted)).

Here, the record clearly indicates that Farrah's primary language is Somali and that, as the prosecutor noted, he "speaks with a heavy accent." At the beginning of the recorded police interrogation, Farrah told the officer that he did not speak English very well. Although the services of an interpreter were available, none were provided because the officer felt that Farrah had an adequate comprehension of the officer's questions. The officer acknowledged, however, that at times he had difficulty understanding Farrah because of Farrah's accent. Farrah's cousin also testified that "[o]ne fact that we see as a family is that people are speculating Burhan knows English very well, and that is not true."

■ To protect or facilitate the exercise of constitutional rights, it is the express policy in Minnesota to provide qualified interpreters to assist persons in legal proceedings who are handicapped in communication (now referred to as "disabled in communication"). Minn.Stat. § 611.30 (2006).[5] Under this policy, following the apprehension or arrest of a person disabled in communication, law enforcement has the obligation to obtain a language interpreter to assist the person throughout custodial interrogation. Minn.Stat. § 611.32, subd. 2 (2006).[6] A person dis-

---

5. By 2005 revisor instruction, the term "handicapped" was changed to "disabled" wherever it appears in the statutes. Act of May 16, 2005, ch. 56, § 1, 2005 Minn. Laws 337, 337. Because there appears to be no substantive difference between the terms, we will subsequently use the term disabled and reference the current statutes.

6. Minnesota Statutes § 611.32, subd. 2, provides:

Following the apprehension or arrest of a person disabled in communication for an alleged violation of a criminal law, the arresting officer, sheriff or other law enforcement official shall immediately make necessary contacts to obtain a qualified interpreter and shall obtain an interpreter at the earliest possible time at the place of detention. * * * Prior to interrogating or taking the statement of the person disabled in communication, the arresting officer, sheriff, or other law enforcement official shall make available to the person a qualified interpreter to assist the person

abled in communication includes one who, "because of difficulty in speaking or comprehending the English language, cannot fully understand the proceedings or any charges made against the person * * * or is incapable of presenting or assisting in the presentation of a defense." Minn.Stat. § 611.31 (2006). The term disabled in communication also includes persons disabled in expression or comprehension of the English language. *Cf. State v. Mitjans* 408 N.W.2d 824, 829 (Minn.1987) (stating that Spanish speaking defendant "was no more [disabled] in understanding and in expressing himself to [a bilingual police officer] than an English-speaking suspect is in understanding and in expressing himself to an English-speaking officer").

That Farrah had difficulty in expressing himself in English was underscored by the disposition of his claim that he asserted his right to counsel. When a suspect asks for counsel, questioning must cease "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The request for counsel must be clear and unequivocal. *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that in a post-waiver situation, *Edwards* does not require that questioning stop upon the equivocal or ambiguous reference to an attorney). The inquiry as to the clarity of a suspect's request for counsel is objective; the interrogating officer need not stop questioning if "a reasonable police officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis,* 512 U.S. at 458–59, 114 S.Ct. 2350. In Minnesota, if the

request is equivocal, the police must stop and clarify, asking only narrow questions designed to clarify the suspect's intentions. *State v. Risk,* 598 N.W.2d 642, 648–49 (Minn.1999).

Here, the interrogation transcript showed that Farrah told the officer, "Okay I think I will talk to lawyer, (inaudible)." The district court listened to the recorded statement several times and noted the accuracy of the transcript but nevertheless determined that the request for counsel was equivocal based on its finding that there was a legitimate lack of clarity on the officer's part as to what Farrah had said. In other words, the officer did not understand Farrah's request because of Farrah's poor language skills. *See* Minn. Stat. § 611.31. Because Farrah was disabled in communication, the obligation to provide the services of a language interpreter attached.

As to the waiver of rights, the district court made no specific finding regarding Farrah's language skills, stating "I don't know right now Mr. Farrah's proficiency in language." The court indicated that the need for an interpreter at trial did not imply an inability to understand and waive *Miranda* rights, but also noted that noncompliance with the interpreter statutes can be relevant in evaluating the validity of a waiver. The court determined that Farrah had been given a warning, that he waived his rights, and that there was "no [ ] evidence to conclude that it * * * was not a knowing and intelligent waiver."

In our view, the totality of the circumstances surrounding the interrogation do not make known whether Farrah's *Miranda* waiver was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Farrah was ad-

throughout the interrogation or taking of a statement.

vised of his rights orally in English. He was not advised of his rights in Somali, he was not given a written waiver to sign in either English or Somali, and he did not have the assistance of a language interpreter. *Cf. State v. Dominguez–Ramirez,* 563 N.W.2d 245, 250, 253 (Minn.1997) (concluding that defendant's waiver of his *Miranda* rights was valid where the *Miranda* advisory was read in Spanish three times, he was shown a *Miranda* advisory written in Spanish, he signed the written version, and the police provided an interpreter for the interrogation). Farrah indicated that he did not understand the advisory, prompting repetition of the advisory; and other than the right to counsel, there is no evidence that each component of the advisory was adequately explained.

The dissent, however, notes that the interrogating officer felt that he and Farrah understood each other and that medical evaluations done in October 2003 and September 2004 indicated that Farrah had adequate comprehension of English. But the officer also admitted to repeating or explaining questions when Farrah had trouble understanding, the interrogation itself reflected the officer's and Farrah's problems in communication, there was other evidence that Farrah did not comprehend English all that well, and Farrah was provided language-interpreter services for the medical evaluations as well as for trial.

"A defendant who does not understand English can give an effective waiver if the warnings were given in his native tongue." 2 Wayne R. LaFave, et al., *Criminal Procedure* § 6.9(b) (2d ed.1999). As we have said before, prudent investigators would be wise to implement a system for the provision of language-interpreter services for persons disabled in communication. *E.g., State v. Sanchez–Diaz,* 683 N.W.2d 824, 835 (Minn.2004) (stating that prudent police investigators should comply with the statutory requirements for language services); *Mitjans,* 408 N.W.2d at 831 (stating that "[i]n the future, prudent police investigators * * * are advised to comply with the statutory requirements" for language services); *State v. Vu,* 339 N.W.2d 892, 898 (Minn.1983) (stating that "the police and the trial court would be wise to engage an interpreter before interrogation so that this issue need never arise again in Minnesota"). Here, the warnings were not given in Farrah's own language, and under the totality-of-the-circumstances test, we hold that the state did not meet its burden to prove that Farrah knowingly and intelligently waived his *Miranda* rights.

 Still, the admission of a defendant's statements to police at trial in violation of *Miranda* does not require a new trial if the state can show beyond a reasonable doubt that the error was harmless. *See State v. Juarez,* 572 N.W.2d 286, 291 (Minn.1997). If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt. *Id.* at 292 (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Following the *Chapman/Juarez* standard, the question then becomes: "What effect did the jury's hearing [the defendant's] statement * * * actually have on the guilty verdict rendered?" *Id.*

The state argues that any error in the admission of the recorded police statement was beneficial to Farrah because the statement placed his denial of any wrongdoing before the jury without requiring his testimony. But the statement contained Farrah's admission that he was in his car with the complainant. When the officer asked him what the complainant might say about what happened in his car, he said "(inaudible) rubbed her." Farrah's statement was the last piece of evidence presented by the prosecution in its case-in-chief. In closing

argument, the prosecutor told the jury that Farrah's statement was "significant" because it showed that he was concerned about the complainant's age "from the beginning." The prosecutor told the jury that the "rubbed her" comment was "most significant" because the officer had not mentioned the allegations against Farrah. The prosecutor told the jury that Farrah said that "because that's exactly what happened." The prosecutor argued that Farrah's claim of having a boyfriend/girlfriend conversation with C.B. was incredible, unbelievable, and evidence of his guilt. Given the evidentiary value the state placed on Farrah's statement, we cannot conclude that the verdict was "surely unattributable" to the erroneous admission of the statement, and we hold that the error was not harmless beyond a reasonable doubt, thus warranting a new trial.

## II.

■ Having concluded that a new trial is required, we need not reach Farrah's claim of error in the admission of C.B.'s out-of-court statements, but we will briefly address the claim because the admissibility of the statements is likely to arise in the new trial. C.B.'s statements to the 911 caller and Officer Wilson were properly admitted at trial. An out-of-court statement made by a witness who testifies at trial and is subject to cross-examination is not hearsay if it is "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Minn. R. Evid. 801(d)(1)(D); *see State v. Pieschke*, 295 N.W.2d 580, 582, 584 (Minn.1980) (holding that statements made within a few minutes of an accident were close enough in time to qualify under Rule 801(d)(1)(D), although statements made almost an hour after the incident were taken too long after the incident to qualify).

C.B.'s statements to her grandmother and best friend were offered as prior consistent statements. "A statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and helpful to the trier of fact in evaluating the declarant's credibility as a witness * * *." Minn. R. Evid. 801(d)(1)(B). Thus, when a witness' prior statement contains assertions about events that have not been described by the witness in trial testimony, those assertions are not helpful in supporting the credibility of the witness and are not admissible under this rule. Minn. R. Evid. 801(d)(1) Comm. Cmt.–1989. "What seems important is that the exception should not be the means to prove new points not covered in the testimony of the speaker." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 405 (2d ed.1994).

■ Rule 801(d)(1)(B), as amended in 1990, was aimed in part at addressing some confusion related to the treatment of prior consistent statements as non-hearsay when offered to corroborate trial testimony. "Under the amended rule, prior consistent statements can be admitted to enhance the credibility of a witness and as substantive evidence if the court determines the statements would be helpful in evaluating credibility." 11 Peter N. Thompson, Minnesota Practice—*Evidence* § 801.01 (3d ed.2001). To be helpful, however, the credibility of the witness must have been challenged. *State v. Nunn*, 561 N.W.2d 902, 909 (Minn.1997). The district court retains the discretion under Minn. R. Evid. 403 and 611 to limit or preclude cumulative prior statements. *Nunn*, 561 N.W.2d at 909; Thompson, *supra*, § 801.07. Accordingly, assertions consistent with the complainant's testimony would be admissible if helpful in evaluating

credibility, subject of course to the court's discretion to limit or preclude cumulative evidence. If the assertions are not consistent, they would be admissible, if at all, only if the district court exercises its discretion and determines that they meet the criteria of the residual hearsay exception of Minn. R. Evid. 807.

Reversed and remanded for a new trial.

Concurring in part, dissenting in part, GILDEA, MEYER, and ANDERSON, G. BARRY, JJ.

GILDEA, Justice (concurring in part; dissenting in part).

I agree with the majority's analysis of the evidentiary issue in section II, but I respectfully dissent from section I of the majority opinion. I would hold that the district court did not clearly err when it found that Farrah understood the English language well enough to knowingly waive his *Miranda* rights. I would therefore conclude that the state has met its burden to prove that Farrah waived his *Miranda* rights.

We review the legal question of whether a suspect knowingly waived his *Miranda* rights de novo. *State v. Ray*, 659 N.W.2d 736, 742 (Minn.2003). But we review the factual findings underlying that legal conclusion for clear error. Id. A finding is not clearly erroneous simply because an appellate court might have resolved the question differently. *Stiff v. Associated Sewing Supply Co.*, 436 N.W.2d 777, 779 (Minn.1989) ("An appellate court exceeds it proper scope of review when it bases its conclusions on its own interpretation of the evidence and, in effect tries the issues anew and substitutes its own findings for those of the trial judge."); *see also Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 102 (Minn.1999) ("An appellate court may not reverse a trial court due to mere

disagreement with its findings."); *Gjovik v. Strope*, 401 N.W.2d 664, 668 (Minn.1987) (noting that an appellate court "should not substitute its findings for that of the trial court merely because it feels that the case was wrongly decided"). Instead, the clearly erroneous standard means that the finding below will stand unless it "is not reasonably supported by the evidence as a whole." *EOP–Nicollet Mall, L.L.C. v. County of Hennepin*, 723 N.W.2d 270, 284 (Minn.2006) (internal quotation marks omitted); *see also Miles v. City of Oakdale*, 323 N.W.2d 51, 54 (Minn.1982) ("We have defined a clearly erroneous finding variously to mean palpably and manifestly against the weight of the evidence or not reasonably supported by the evidence as a whole.").

Whether a defendant understands English well enough to be able to waive his *Miranda* rights is a factual question. A district court's factual finding related to this question is reviewed for clear error. *See United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1127 (9th Cir.2005) ("The district court's finding that [the defendant's] alleged difficulty with English did not prevent him from knowingly and intelligently waiving his *Miranda* rights was not clearly erroneous."), *amended by* 416 F.3d 939 (9th Cir.2005); *United States v. Marrero*, 152 F.3d 1030, 1034 (8th Cir. 1998) (holding "that district court did not clearly err in finding that defendant could understand English and that he effectively waived his *Miranda* rights"); *United States v. Vue*, 13 F.3d 1206, 1209 (8th Cir.1994) (same).

Here, the district court heard testimony from the interrogating officer, considered two psychologist's reports, both of which stated that Farrah was able to communicate adequately in English, and listened to

Farrah's taped statement.[7] Based on this evidence, the district court concluded that even if Farrah was entitled to an interpreter at trial, his English skills were sufficient to support a knowing waiver.[8]

The district court's finding regarding Farrah's language skills is supported by the evidence in the record. First, the officer conducting the interview testified at the suppression hearing in part:

Q: [D]id he have any difficulty listening to or following questions that you asked?

A: He didn't appear to, no.

Q: Did he appear to have any difficulty enunciating his words?

A: It was obvious to me that he had a strong accent, but I didn't feel that he was unable to understand, nor was I unable to understand him.

Second, a forensic evaluation report dated September 10, 2004, describes records from Farrah's hospitalization in October 2003. The notes from this hospitalization reflect that "[h]e was able to communicate adequately in English, but used the interpreter at times." This hospitalization was just one month before Farrah's interview with police that is at issue in this case. Third, in the recorded interview, Farrah responds appropriately to the officer's questions. Although he says he only understands a "[l]ittle" English, that claim is belied by Farrah's reaction and responsiveness to the questions posed to him. In short, the evidence supports the district court's factual finding, and therefore, the finding is not clearly erroneous.

The majority does not directly hold that the district court's finding is clearly erroneous. Rather, the majority largely ignores the district court on the key issue in this case, and finds for itself that "Farrah had difficulty in expressing himself in English." With this factual predicate, the majority then concludes Farrah was "disabled" in communication, and therefore entitled to an interpreter under Minn.Stat. § 611.32, subd. 2 (2006). In my view, the majority is doing precisely what our precedent prohibits—substituting its judgment on a fact question for that of the district court. *E.g.*, *Gjovik*, 401 N.W.2d at 668.

To support its factual finding that Farrah was "disabled" in communication, the majority cites the district court's "disposition of [Farrah's] claim that he asserted his right to counsel," but it does not find that the district court erred in its resolution of that question. The district court concluded that Farrah's statement about a

---

**7.** From its review of the tape, the district court noted that "there is occasional difficulty in understanding what [Farrah] is saying," but that "there is an occasional difficulty in understanding a number of things said in the *Scales* tape by people who are English speakers * * *."

**8.** The majority notes that "the district court made no specific finding regarding Farrah's language skills" and then quotes the district court as saying "I don't know *right now* Mr. Farrah's proficiency in language." (Emphasis added.) This statement was made in reference to Farrah's request for an interpreter at trial. As the district court noted, "the fact that an interpreter is needed for court proceedings does not automatically mean that

[Farrah] is unable to waive his rights or understand his rights under *Miranda*." With respect to the waiver issue, I acknowledge that the district court made no written findings. But I do not agree with the majority's suggestion that the district court did not find as a fact that Farrah understood English well enough to have waived his rights. The district court said that after "listening to the overall tape, * * * I believe that there is not evidence to conclude that it * * * was not a knowing and intelligent waiver." Based on its review of the evidence, the court concluded, "it doesn't make sense to me that [Farrah] didn't know what he was saying and that he didn't know what he was doing" in speaking to police.

lawyer was not unequivocal when considered in context. The record reflects that the officer did what our cases require on the question of whether a suspect has requested counsel. When Farrah made an equivocal statement about a lawyer, the officer inquired further. *See State v. Risk,* 598 N.W.2d 642, 648–49 (Minn.1999). In response to this inquiry, the transcript reflects the following exchange:

Q: Yup and before I talk to you about that you need to understand these, that you do have the right to talk to a lawyer first do you understand that?

A: Like even if I have a lawyer . . .

Q: Then they will give you one for free. In other words you don't have to talk to me right now, although I would like to, to find out what happened.

A: Okay.

Q: But you don't have to you can talk to a lawyer first if that is what you want to do?

A: Okay.

Q: So do you understand that?

A: Yeah.

Q: Okay having your rights in mind do you want to talk to me now?

A: Yeah go ahead.

Q: Okay you don't want to talk to a lawyer first?

A: No I don't want to.[9]

It was only after securing this understanding that the officer proceeded with the interrogation.

We have said that the state is deemed to have met its burden "to prove by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his [*Miranda*] right[s]" if the state can show that "the *Miranda* warnings were given, the defendant stated he understood those warnings, and the defendant gave a statement." *State v. Ganpat,* 732 N.W.2d 232, 240 (Minn.2007). In reaching the conclusion that Farrah's statements must be suppressed, the majority seems to be holding that the state will be unable to meet its burden anytime an immigrant is not read the warning in his native language or provided an interpreter.[10] I cannot embrace such a broad holding. In my view, whether a suspect understands English well enough to waive his rights is inherently a fact question that absent clear error, we should leave to the district court. Here, it is undisputed that the *Miranda* warnings were given and repeated. Farrah stated that he understood the warnings, and the district court found that Farrah's difficulties with English did not inhibit his ability to waive his rights. Farrah then gave a statement. On this record, I would hold that the state has met its burden, and would affirm.

MEYER, J. (concurring in part; dissenting in part).

I join in the concurrence and dissent of Justice Gildea.

---

**9.** While the majority seems to fault the officer for not going over all of Farrah's *Miranda* rights a third time, the record reflects that the right to counsel was the only one Farrah questioned. Thus, it was proper for the officer to focus on this right for additional follow-up.

**10.** Even if I were to assume that Farrah was disabled in communication and therefore entitled to an interpreter under Minn.Stat. § 611.32, subd. 2, it would not lead me to conclude that suppression is required. *See State v. Sanchez–Diaz,* 683 N.W.2d 824, 835 (Minn.2004) (noting that the statutory right to have an interpreter present at an interrogation "is not a constitutional one and violation of the statute does not require the application of the exclusionary rule").

ANDERSON, G. BARRY, J. (concurring in part; dissenting in part).

I join in the concurrence and dissent of Justice Gildea.