**In re Petition for DISCIPLINARY ACTION AGAINST John O. MURRIN, III, a Minnesota Attorney, Registration No. 7679X.**

No. A11–0108.

Supreme Court of Minnesota.

Sept. 19, 2012.

Martin A. Cole, Director, Kevin T. Slator, Senior Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, MN, for petitioner.

John O. Murrin, III, Long Beach, CA, pro se.

OPINION

PER CURIAM.

In December 2010, the Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against Respondent John O. Murrin, III, alleging that Murrin had violated Minn. R. Prof. Conduct 3.2 and 8.4(d). The Director's allegations arose from Murrin's conduct while attempting to recoup money Murrin lost in a Ponzi scheme.[1] More

1. **Ponzi scheme.** A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments.

●Money from the new investors is used directly to repay or pay interest to earlier investors, usu. without any operation or revenue-producing activity other than the continual raising of new funds. This

specifically, the alleged misconduct involved legal actions Murrin commenced in three separate courts: (1) Hennepin County District Court, (2) United States District Court for the District of Minnesota, and (3) United States Bankruptcy Court for the District of Minnesota. We assigned a referee to conduct an evidentiary hearing on the petition. After conducting the evidentiary hearing, the referee found that Murrin violated Minn. R. Prof. Conduct 3.2 and 8.4(d) in each of the three courts and recommended that Murrin be suspended from the practice of law for 1 year.

On appeal to our court, Murrin makes the following four primary arguments: (1) the Director exceeded his authority under Rule 8(a) of the Rules on Lawyers Professional Responsibility (RLPR) by conducting an investigation into Murrin's conduct without the approval of the Executive Committee of the Lawyers Professional Responsibility Board; (2) the referee gave improper collateral estoppel effect to certain court orders and admonishments by judges who presided over Murrin's actions; (3) certain aspects of the disciplinary proceedings deprived Murrin of due process; and (4) Murrin did not engage in unprofessional conduct warranting discipline. We conclude that the referee's findings are not clearly erroneous and hold that Murrin violated Minn. R. Prof. Conduct 3.2 and 8.4(d), and that he should be suspended from the practice of law for 6 months.

Respondent John O. Murrin III was admitted to practice law in Minnesota in 1978. Before this disciplinary proceeding, Murrin's disciplinary history included two admonishments: (1) one in 1985 for improper behavior at a deposition, and (2) the other in 1999 for offering an improper employment agreement. During his career, Murrin practiced bankruptcy, divorce, and trade practices law, as well as general litigation. Murrin is now semi-retired.

In 2004, Murrin and his wife invested $600,000 in Avidigm Capital Group, Inc., a real estate organization. Avidigm agreed to make interest payments to the Murrins for 15 months and then return the principal of $600,000 to the Murrins. At first, Avidigm made regular interest payments to the Murrins. But in 2006, the Murrins became aware that Avidigm was no longer making payments. Additionally, Avidigm failed to return the Murrins' principal investment and a $900,000 security in land that Avidigm earlier had offered to protect the Murrins' investment turned out to be worth $200. After conducting an investigation of Avidigm, the Murrins discovered that Avidigm was operating a Ponzi scheme, and that the Murrins had been defrauded.

In 2007, Murrin and/or his wife commenced three separate actions in three different courts against Avidigm and the individuals allegedly responsible for the fraud. Murrin, his wife, and another lawyer, Christopher LaNave, each represented the Murrins in various capacities. The Director requests that we discipline Murrin based on Murrin's conduct in these three actions. We will review of the facts of each of these actions in turn.

*Action in Hennepin County District Court*

On January 12, 2007, Murrin's wife filed a Summons and Complaint in Hennepin County District Court, listing herself as a pro se attorney. A month later, on Febru-

---

scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston.

*Black's Law Dictionary* 1198 (8th ed.2004).

ary 12, 2007, Murrin filed a First Amended Complaint and signed the complaint as "Attorney for Plaintiff." The amended complaint named nearly 50 defendants, contained 493 paragraphs on 131 pages, and listed 27 counts.

On April 20, 2007, Murrin filed a motion to amend his First Amended Complaint to include an additional defendant. The district court granted the motion and Murrin filed a Second Amended Complaint, which named the new defendant and asserted an additional count against the defendant. In June 2007, that defendant removed the case to the United States District Court for the District of Minnesota. Murrin moved to remand the case to state district court. The federal district court granted Murrin's motion and remanded the case to state district court, where a state district court judge, other than the judge who previously heard the case, presided. After reviewing the case on remand, the state district court considered the Second Amended Complaint to be the operative complaint.

On January 9, 2008, Murrin filed a motion requesting leave to file a Third Amended Complaint. Murrin signed the Third Amended Complaint as the attorney. On January 10, 2008, three defendants appeared before the district court and argued that they "were unable to determine what claims were being leveled against them." The court "independently reached the same conclusion" and on January 15 ordered Murrin to "provide the Court and opposing parties with a chart clearly delineating which claim is being pursued against which Defendant for each cause of action contained in the Second Amended Complaint." On January 25, Murrin submitted a chart to the court, but the court concluded that the "chart provided no further clarification to the Court or to Defendants." On February 14, the district court

denied Murrin's motion to file the proposed Third Amended Complaint because the court concluded that the "[d]efendants [stood] to suffer prejudice if [Murrin were] granted leave to amend."

The court explained that both the Second and proposed Third Amended Complaint "were incomprehensible and rife with errors." For example, the court stated that the complaints "failed to provide accurate statutory citations and consequently alleged that Defendants violated statutes regarding Minnesota's unorganized militia statute," as well as other unrelated statutes. Further, the court stated that in addition to "cit[ing] to statutes which have been repealed, renumbered, or never existed," the complaints "lumped distinct causes of action into single counts." Finally, the court stated that the "flaws [in the Second Amended Complaint] have not been adequately addressed by the Third Amended Complaint." The court noted that Murrin's "Third Amended Complaint is 187 pages in length and contains 777 individually numbered paragraphs. As with the Second Amended Complaint, it is unclear what claims are being asserted and on which factual allegations [Murrin] relies." Thus, in addition to denying Murrin's motion to file a Third Amended Complaint, the court concluded that Murrin's Second Amended Complaint failed to comply with Minn. R. Civ. P. 8.01, which requires complaints to contain a "short and plain statement of the claim," and Minn. R. Civ. P. 8.05(a), which requires that each averment of a pleading is "simple, concise, and direct."

On April 11, Murrin filed a motion requesting leave to file a Fourth Amended Complaint. Murrin signed the Fourth Amended Complaint, which named 43 defendants, contained 1,668 numbered paragraphs on 272 pages, and listed 132 counts. The district court subsequently denied

Murrin's motion to amend because Murrin "continue[d] to allege claims that could not be made as a matter of law or on the known factual record."

On April 29, the parties appeared before the district court for a hearing. At this hearing, the defendants indicated that they intended to pursue sanctions against Murrin. The court later stated that following this hearing, Murrin was "aware that [his] behavior in litigating this case was sanctionable."

Before the district court had an opportunity to rule on Murrin's motion to file the Fourth Amended Complaint, Murrin filed a Fifth Amended Complaint. The Fifth Amended Complaint named 43 defendants, contained 945 paragraphs on 165 pages, and listed 64 counts. The court later noted that the Fifth Amended Complaint "again ... allege[d] claims that could not be made as a matter of law or on the known factual record and alleges claims against Defendants with whom [Murrin] had already settled or parties who were no longer part of the case."

On June 13, the district court dismissed with prejudice the Second Amended Complaint in its entirety against all but two defendants. For the two remaining defendants, the court dismissed the Second Amended Complaint without prejudice. The court concluded that the complaint "violated Rules 8.01, 8.05, 9.02, and 10.02 of the Minnesota Rules of Civil Procedure and failed to give Defendants fair notice of the claims alleged against them." In dismissing the complaint, the court noted that Murrin "abused the litigation process and ... refused to follow the rules and directives of the court. A sanction under Rule 41.02(a) is justified." The court then dismissed the Murrins' lawsuit as to all defendants. The court also granted summary judgment in favor of three defendants.

On December 2, the district court, ruling on several defendants' motions for sanctions, concluded that Murrin, Murrin's wife, and LaNave "engaged in oppressive, unethical, and deceitful litigation strategies. What should [have been] a simple collection action against Avidigm and its principals [w]as ... transformed into a prohibitively complex litigation." The court then ordered sanctions against Murrin, Murrin's wife, and LaNave totaling over $463,000.00. The court found Murrin, Murrin's wife, and LaNave jointly and severally liable for the sanctions, and permanently enjoined each of them from bringing another action based upon the subject matter in the case.

Murrin appealed. The court of appeals first affirmed the district court's disposition of the case in *Murrin v. Mosher*, No. A08–1418, 2009 WL 2366119 (Minn.App. Aug. 4, 2009), *rev. denied* (Minn. Oct. 28, 2009). Then the court of appeals affirmed the sanctions against Murrin, stating that the district court did not abuse its discretion by invoking its inherent authority to impose the sanctions, but concluded that the sanctions against Murrin's wife were inappropriate. *See Murrin v. Mosher*, No. A09–314, 2010 WL 1029306 (Minn.App. Mar. 23, 2010), *rev. denied* (Minn. Aug. 10, 2012).

*Action in the United States District Court for the District of Minnesota*

On January 12, 2007, Murrin's wife filed a First Amended Complaint in Ramsey County District Court, listing herself as a pro se attorney. It appears that the complaint named nearly 30 defendants, including "Doe[ ] I—X." The complaint contained 626 paragraphs on 153 pages and listed 35 counts. The record indicates that certain defendants removed the case to federal district court.

Once in federal district court, both a magistrate judge and a federal district court judge presided over Murrin's case. On September 20, 2007, Murrin filed a motion requesting leave to file a Second Amended Complaint. The proposed Second Amended Complaint, which Murrin signed, contained 745 paragraphs on 186 pages and listed 36 counts. In deciding whether to grant Murrin's motion to amend, the federal district court compared Murrin's "litigation strategy" to *"peine forte et dure*—a method of torture by which heavier and heavier weights are placed on the chest of a defendant until the defendant either confesses or suffocates." The court explained that it would "not permit [Murrin] to bury [his] opponent[ ]— and the Court—under mountains of paper." For that reason, the court dismissed the Murrins' First Amended Complaint for failing to comply with Fed.R.Civ.P. 8.[2] The court went on to deny Murrin's motion to file a Second Amended Complaint, stating that "like the first amended complaint, [the Second Amended Complaint] is an endless, repetitious, and confounding collage of allegations. Needless to say, the Court will not give [Murrin] permission to commit an even more egregious violation of Rule 8." Finally, the court stated that in order to continue the litigation, Murrin had to file an amended complaint by March 31, 2008, that met certain length and content requirements.

On March 30, LaNave filed a Third Amended Complaint. This complaint contained 187 paragraphs on 67 pages and listed 31 counts. The record indicates that between March 30 and November 24 Murrin filed or attempted to file a Fourth Amended Complaint and a Fifth Amended Complaint. In response, the magistrate judge presiding over the case ordered Murrin to "file a **FINAL** Amended Complaint containing those claims which have not previously been dismissed, and which we have granted leave to plead." On November 24, Murrin filed a motion requesting leave to file a Sixth Amended Complaint.[3] The magistrate judge concluded that Murrin's Sixth Amended Complaint violated the court's earlier order. The magistrate judge then stated that he would "not legitimize [Murrin's] disobedience of the clear directives of the Court," and denied Murrin's motion for leave to amend. Finally, the magistrate judge again ordered Murrin to "file a **FINAL** Amended Complaint that conforms, to the letter, with the prior rulings of this Court."

On April 15, Murrin filed a Sixth Amended Complaint in an effort to comply with the magistrate judge's order. Murrin also sought a default judgment against Avidigm and its CEO, who had failed to answer and appear. The federal district court granted default judgment in the amount of $1,760,000 against Avidigm and its CEO, but denied in part the Murrins' request for $250,000 in attorney fees. The court stated that "[a]ny competent attorney could have filed a complaint against Avidigm and [its CEO]—a simple complaint running five to ten pages—and, once Avidigm and [its CEO] failed to answer, obtained a default judgment for the amount due under the contract." *Murrin v. Avidigm Capital Grp., Inc.,* No. 07–CV–1295, 2010 WL 1257642, at *2 (D.Minn. Mar. 25, 2010). The court went on to

**2.** To the extent that the magistrate judge recommended that some of Murrin's claims be dismissed with prejudice and on the merits, the court adopted the magistrate judge's recommendation. The court then dismissed the remainder of the First Amended Complaint.

**3.** Murrin states in his brief to this court that these complaints "sought only to deal with . . . nonappearing parties. . . ."

explain that "[i]t should not have taken three years, four lawsuits, thousands of pages of filings, and a half-million dollars in attorney's fees to get to this point." *Id.* Based on this reasoning, the court concluded the "Murrins' fee request [was] patently unreasonable" and awarded only $10,000 in attorney fees. *Id.* at *3.

*Action in United States Bankruptcy Court for the District of Minnesota*

On February 27, 2007, two of the named defendants in the Hennepin County action filed for Chapter 7 bankruptcy and listed the Hennepin County action as a contingent claim against them. Murrin responded by commencing an adversary proceeding against these defendants in the bankruptcy court. The bankruptcy court later stated that the "original [adversary] complaint was 45 unnumbered pages in length, plus a three-page documentary attachment. It is an understatement to note that the wording of the text was dense, repetitious, fervid, and hyperbolic." *In re Scott,* 403 B.R. 25, 30 (Bankr. D.Minn.2009).

Counsel for the defendants—the debtors in the bankruptcy proceeding—answered the adversary complaint, but expressed the debtors' concern about the "length and prolixity of the complaint, and its relative lack of direct references to acts by the [debtors] that could be linked to any harm that had been inflicted on [Murrin] by or through Avidigm." The bankruptcy court agreed with debtors' counsel. Murrin then sought leave to amend the complaint; but, the court denied this request because the "proposed amendments neither simplified the text of the complaint nor shortened it . . . and certainly did not clarify the basis for a dischargeability claim." Murrin again sought leave to amend. This time, the court granted Murrin's motion, but "the field was left clear for a disposi-

tive motion from the defense, for dismissal or judgment on the pleadings."

The debtors then moved for dismissal and the bankruptcy court granted the motion. In dismissing the case, the court stated: "Murrin had ample opportunity to step far back from the invested and emotionally-charged posture of a party-litigant . . . and to act professionally as an officer of the court to avoid a waste of judicial and party resources." *In re Scott,* 403 B.R. at 46. The court went on to explain that Murrin "did not make responsible use of that opportunity. He certainly is not to be granted a fourth try. This matter is ripe for a disposition with prejudice to further litigation on the merits."

*Procedural History of Disciplinary Action*

The Hennepin County District Court judge presiding over Murrin's action in that court sent a letter concerning Murrin's conduct to the Director of the Office of Lawyers Professional Responsibility and attached to her letter a copy of her order imposing sanctions on Murrin, Murrin's wife, and LaNave. After receiving the judge's letter, the Director's office commenced an investigation into Murrin's conduct and gave Murrin notice of that investigation. The Director's office testified at Murrin's evidentiary hearing that a sitting judge who files a complaint against an attorney with the Director has the "opportunity to [decline to] be a complainant." In this case, the judge declined to be a complainant, and the investigation continued in the Director's name instead.

Following the Director's investigation, the matter was submitted to a Panel of the Lawyers Professional Responsibility Board, which found that there was probable cause to believe that public discipline against Murrin was warranted. The Director then filed a petition for disciplinary action against Murrin, alleging Murrin vio-

lated Minn. R. Prof. Conduct 3.2[4] and 8.4(d)[5]. On January 27, 2011, Murrin filed a motion with our court requesting the following relief: (1) a stay in the disciplinary proceedings for various reasons, (2) an order barring the Director from issuing a press release about the disciplinary proceeding, (3) an order sealing his disciplinary file during the stay, and (4) the consistent appointment of a referee "who is not personally familiar with or friends with the particular judges and parties, and their counsel involved in the underlying cases." We denied Murrin's motions except the request to stay the proceedings, which we referred to the referee to be appointed. *In re Murrin*, No. A11–108, Order at 2–3 (Minn. filed Mar. 3, 2011). We then appointed a referee.

The referee held an evidentiary hearing on this matter on August 1 and 2, 2011. At the hearing, Murrin, Murrin's wife, and a paralegal who had worked for Murrin testified. Also at the hearing, the referee admitted into evidence various orders by the judges involved in the Hennepin County, District of Minnesota, and Bankruptcy Court proceedings. Some of these orders included the previously discussed admonishments by the judges in these proceedings.

Following the hearing, the referee found that Murrin's conduct in each of the three actions violated Minn. R. Prof. Conduct 3.2 and 8.4(d). As to aggravating or mitigating factors, the referee found that Murrin had "no appreciation, no understanding of the damage his complaints inflicted upon the defendants. Neither does he comprehend his duty to the courts." The referee also found that Murrin's "attitude toward the evidence presented at [the] hearing

approaches the delusional in its unfailing rejection of the reasoned, learned criticisms of his litigation conduct." The referee recommended that Murrin be suspended from the practice of law for 1 year. The referee based this recommendation on Murrin's "egregious, persistent conduct which disrupted litigation in three different courts, causing excessive delay and enormous costs to the opposition and to the courts." Murrin appealed the referee's findings and recommendations to our court, and requested a transcript of the hearing.

Before our court, Murrin makes the following arguments: (1) the Director exceeded his authority under Rule 8(a) of the Rules on Lawyers Professional Responsibility (RLPR) by conducting an investigation into Murrin's conduct without the approval of the Executive Committee of the Lawyers Professional Responsibility Board; (2) the referee gave improper collateral estoppel effect to certain court orders and admonishments by judges who presided over Murrin's actions; (3) certain aspects of the disciplinary proceedings deprived Murrin of due process; and (4) Murrin did not engage in unprofessional conduct warranting discipline.

I.

■ We first turn to Murrin's argument that the Director exceeded his authority under Rule 8(a), RLPR, by conducting an investigation into Murrin's conduct without the approval of the Executive Committee of the Lawyers Professional Responsibility Board. Interpretation of the Rules on Lawyers Professional Responsibility is a legal question we re-

---

4. Rule 3.2 states: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

5. Rule 8.4(d) states: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."

view de novo. *In re Nathanson*, 812 N.W.2d 70, 77 (Minn.2012). In doing so, we consider the plain meaning of the rule's language. *Id.*

Rule 8(a), RLPR, states:

At any time, with or without a complaint or a District Committee's report, and upon a reasonable belief that professional misconduct may have occurred, the Director may make such investigation as the Director deems appropriate as to the conduct of any lawyer or lawyers; provided, however, that *investigations to be commenced upon the sole initiative of the Director shall not be commenced without the prior approval of the Executive Committee.*

(Emphasis added.) Under the plain meaning of this rule, the Director may commence an investigation without Executive Committee approval when the Director is not acting upon his sole initiative—that is, the Director does not need Executive Committee approval to commence an investigation when the Director is acting pursuant to a complaint. *See Nathanson*, 812 N.W.2d at 77 (analyzing the language in Rule 8(a), RLPR, and explaining that the Director does not act upon his sole initiative when he acts "pursuant to a complaint"). In contrast, when the Director does act upon his sole initiative, the limitation set out in Rule 8(a)—the requirement of Executive Committee approval-applies to the Director's investigation. Rule 8(a), RLPR; *See Nathanson*, 812 N.W.2d at 77. Here, it is undisputed that the Director did not obtain approval from the Executive Committee before commencing the investigation into Murrin's conduct. Thus, we must determine whether the Director commenced the investigation upon his sole initiative.

Murrin argues that because the Hennepin County District Court judge who sent the letter of complaint [6] to the Director declined to be named as a complainant, the Director acted upon his sole initiative. Therefore, Murrin argues the Director violated Rule 8(a), RLPR, by commencing the investigation into Murrin's conduct without obtaining approval from the Executive Committee. We conclude that Murrin's argument lacks merit.

We conclude that when a judge sends a complaint to the Director notifying the Director about an attorney's misconduct, and the Director then commences an investigation into the attorney's conduct based on the judge's complaint, the Director is not acting upon his sole initiative. We reach this conclusion even if, as in this case, the judge subsequently decides against being named as the complainant. Here, because the judge declined to be the named complainant, the Director's name was ultimately substituted for the judge's name on the complaint; but, the Director's investigation nevertheless was prompted by the judge's complaint. Therefore, we conclude that the Director did not commence the investigation upon his sole initiative. Accordingly, we hold that the Director did not violate Rule 8(a), RLPR, because he was not required to obtain Executive Committee approval before commencing his investigation.

## II.

◼ We next turn to Murrin's argument that the referee gave improper collateral estoppel effect to several admonishments contained in court orders that were admitted into evidence at Murrin's disciplinary hearing. Specifically, Murrin argues that

**6.** The judge's complaint took the form of a letter. When a sitting judge reports to the Director a formal, written, credible allegation of attorney misconduct, we deem that report sufficient to constitute a complaint.

the referee failed to conduct an independent review of the facts underlying the admonishments contained in the court orders. In other words, Murrin is concerned that the referee accepted as fact the judges' admonishments that Murrin violated certain state and federal rules of civil procedure and court orders instead of independently determining whether Murrin violated those rules and orders.

Collateral estoppel is "[t]he binding effect of a judgment as to matters actually litigated and determined in one action on later controversies between the parties involving a different claim from that on which the original judgment was based." *Black's Law Dictionary* 279 (8th ed.2004). We have explained that collateral estoppel "precludes relitigation 'of issues which are both identical to those issues already litigated by the parties in a prior action and necessary and essential to the resulting judgment.'" *In re Morris*, 408 N.W.2d 859, 862 (Minn.1987) (quoting *Ellis v. Minneapolis Comm'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn.1982)). A plaintiff who asserts collateral estoppel "to prevent a defendant from relitigating an issue previously decided against the defendant" is using "offensive collateral estoppel." *Black's Law Dictionary* 279 (8th ed.2004) (defining "offensive collateral estoppel"). We have said that offensive collateral estoppel is improper in disciplinary proceedings. *See Morris*, 408 N.W.2d at 862–63. But, we allow a referee to independently consider the transcripts and other documentation from prior proceedings involving the attorney misconduct. *Id.* at 863.

At the evidentiary hearing, Murrin made arguments based on collateral estoppel. The referee responded to Murrin's arguments by stating that he was not giving collateral estoppel effect to the admonishments from the judges presiding over the relevant cases. The referee further stated

that he could not simply accept the judges' admonishments of Murrin as fact. Specifically, at the evidentiary hearing, he stated: "I agree with you that I have to independently review the documents which you are submitting and which the Lawyers Board contends violate the different cited rules of the Lawyers Professional Responsibility Code. And I will do that." Further, Murrin had an opportunity to litigate the relevant conclusions and contest the admonishments contained in the judicial orders admitted as evidence. The hearing transcript is replete with Murrin's explanations as to why his conduct was proper in the cases giving rise to those orders. Finally, while the referee included excerpts from the court orders in his findings of fact, there is no indication in the record that the referee failed to independently review the facts of the three cases and the facts presented during the hearing. For the foregoing reasons, we conclude that the referee did not give improper collateral estoppel effect to the admonishments contained in the court orders admitted into evidence at Murrin's evidentiary hearing.

### III.

■ We next turn to Murrin's argument that the disciplinary proceedings deprived him of due process. Murrin raises arguments based on several aspects of the proceedings. Foremost among those arguments are the following: (1) the admonishments of Murrin in the court orders admitted at the evidentiary hearing constituted inadmissible hearsay; (2) Murrin was unable to cross-examine the judges whose orders were admitted at the evidentiary hearing; (3) "lumping" Murrin's conduct in three separate cases into one disciplinary proceeding was improper because the Director was able to create an "overall impression" of misconduct even if none of the incidents was proved independently; (4) the Director did not establish which

incidents of misconduct were specifically attributable to Murrin and which were attributable to LaNave; and (5) the referee was biased because he had to "pit the credibility of a fellow judge against [Murrin]." Whether due process is required in a particular proceeding, and whether due process has been afforded, are questions of law we review de novo. *See State v. LeDoux*, 770 N.W.2d 504, 512 (Minn.2009).

■ Disciplinary proceedings are neither civil nor criminal. *In re Garcia*, 792 N.W.2d 434, 441 (Minn.2010). Accordingly, while due process must be afforded in disciplinary proceedings, we have said that these proceedings " 'are not encumbered by technical rules and formal [due process] requirements.' " *Id.* (quoting *In re Gherity*, 673 N.W.2d 474, 478 (Minn.2004)). Instead, we have set out the following guidelines for determining whether an attorney received due process in a disciplinary proceeding: if the charges against the attorney were " 'sufficiently clear and specific' " and the attorney was " 'afforded an opportunity to anticipate, prepare and present a defense,' " due process was provided. *Id.* (quoting *In re Gherity*, 673 N.W.2d at 478). In reaching this conclusion, we may also consider whether the attorney had an opportunity for a hearing at which he could present evidence of good character and mitigating circumstances. *Id.*

Several factors support a conclusion that Murrin was afforded due process in the disciplinary proceedings against him. First, the charges against Murrin were clear and specific. The petition recounts the individual complaints filed by Murrin and the relevant court orders, and then asserts that Murrin's conduct "violated Rules 3.2 and 8.4(d), MRPC." Additionally, Murrin filed an answer indicating he understood the charges against him. Second, Murrin was able to anticipate, prepare, and present a defense. At an evidentiary hearing before a neutral factfinder, Murrin had the opportunity to present evidence on his own behalf, call witnesses, and cross-examine witnesses. *See In re Garcia*, 792 N.W.2d at 441. Third, Murrin had the opportunity to present "evidence of good character and mitigating circumstances" at that hearing. *Id.* For the foregoing reasons, we conclude that Murrin was afforded due process in the disciplinary proceedings against him. *See id.*

IV.

■■ The final issue for our consideration is whether Murrin engaged in unprofessional conduct warranting discipline. Because Murrin ordered a transcript of the evidentiary hearing, the referee's findings of facts and conclusions of law are not conclusive. *In re Lyons*, 780 N.W.2d 629, 635 (Minn.2010). Nevertheless, we have said that we "give great deference to the referee's findings and will not reverse those findings unless they are clearly erroneous, especially when the referee's findings rest on disputed testimony or in part on credibility, demeanor, and sincerity." *Id.* Additionally, while we give "great weight" to the sanction recommended by the referee, we alone make the final determination as to the appropriate discipline. *Id.* at 636.

■ Murrin argues that his conduct is "fully explainable in a manner which does not involve any professional wrongdoing and so there should be no basis for discipline." He appears to argue that in each instance, he commenced the original actions and filed the amended complaints based on a good-faith belief that the complaints were necessary to the action or were an attempt to accommodate specific requests by the courts. He also argues that he was "bumping into the conflict between" the requirements that he submit

a "short and plain statement" of his claims and the requirement that he plead fraud with particularity. *See* Minn. R. Civ. P. 8.01 ("A pleading which sets forth a claim for relief ... shall contain a short and plain statement of the claim...."); Minn. R. Civ. P. 9.02 ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). We first must determine whether the referee's findings that Murrin violated Minn. R. Prof. Conduct 3.2 and 8.4(d) were clearly erroneous. *See In re Lyons,* 780 N.W.2d at 634–35. A referee's findings are clearly erroneous only if we are " 'left with the definite and firm conviction that a mistake has been made.' " *Id.* at 635 (quoting *Gjovik v. Strope,* 401 N.W.2d 664, 667 (Minn.1987)).

Here, the record supports the referee's findings that Murrin engaged in professional misconduct in each of the three separate court actions. The record included nearly all of the complaints filed in each case, as well as the specific court orders violated by Murrin when he filed the amended complaints. While the record included the judicial admonishments of Murrin within the relevant court orders, these admonishments were not essential to the referee's determination; the referee could have made identical factual findings based on the enormous number of pages filed and the procedural history of the actions without reference to the specific admonishments by the judges.

Additionally, the referee's findings were based on his evaluation of Murrin's "credibility, demeanor, and sincerity" during the evidentiary hearing. *See In re Lyons,* 780 N.W.2d at 634–35. For example, the referee stated that "[e]ven at the hearing, [Murrin] asserted that his only duty was to his client...." The referee also stated that Murrin's "attitude toward the evidence presented at [the] hearing approache[d]

the delusional in its unfailing rejection of the reasoned, learned criticisms of his litigation conduct." As noted earlier, we defer in particular to a referee's findings on such matters as "credibility, demeanor, and sincerity." *Id.* Because the record supports the referee's findings, and given our deference to the referee, we are not " 'left with the definite and firm conviction that a mistake has been made.' " *Id.* (quoting *Gjovik,* 401 N.W.2d at 667 (Minn. 1987)). Thus, we conclude that the referee's findings that Murrin violated Minn. R. Prof. Conduct 3.2 and 8.4(d) were not clearly erroneous. *Id.*

Having concluded that the referee's findings are not clearly erroneous, we now must determine the appropriate discipline for Murrin. We have said that "the purposes of disciplinary sanctions for professional misconduct are to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *In re Oberhauser,* 679 N.W.2d 153, 159 (Minn.2004). When determining the appropriate discipline for attorney misconduct, we consider the following four factors: "(1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." *In re Nelson,* 733 N.W.2d 458, 463 (Minn. 2007). Although discipline is determined on a case-by-case basis after considering both aggravating and mitigating circumstances, we may look to similar cases for guidance on the appropriate discipline. *In re Rooney,* 709 N.W.2d 263, 268 (Minn. 2006).

*Nature of the Misconduct*

The nature of Murrin's misconduct is serious. Murrin failed to comply with several court orders, continued to name defendants in his pleadings even af-

ter the defendants had been dismissed from the actions by the court, continued to assert claims after the claims had been dismissed, and required three courts and nearly 50 defendants to spend the time and money necessary to wade through thousands of pages of frivolous, unnecessary, or convoluted claims.

*Cumulative Weight of the Disciplinary Violations*

■■■ We distinguish between a "brief lapse in judgment" or "a single, isolated incident" and "multiple instances of mis[conduct] occurring over a substantial amount of time," because the latter warrants more severe discipline. *In re Fairbairn*, 802 N.W.2d 734, 743 (Minn.2011) (citation omitted) (internal quotation marks omitted). In this case, Murrin filed or attempted to file five complaints in the Hennepin County case. In the federal District of Minnesota case, Murrin filed or attempted to file six complaints. In the Bankruptcy Court case, Murrin filed or attempted to file three complaints. Nearly all of these complaints were or could have been dismissed by the courts under Minn. R. Civ. P. 8.01 and 8.05 or Fed.R.Civ.P. 8. Further, Murrin persisted in misconduct for approximately 2 years-from early 2007 until late 2008.

*Harm to the Public and Legal Profession*

■■■ An attorney's failure to follow court rules undermines public confidence in the legal system. *In re Ulanowski*, 800 N.W.2d 785, 801 (Minn.2011). Further, frivolous claims harm the legal profession because the claims waste court resources. *Id.* Here, Murrin caused harm to the public and legal profession by failing to follow court rules and·wasting the resources of three courts. First, Murrin failed to follow court rules and court orders requiring that Murrin's complaints meet certain requirements. Second, Murrin filed or attempted to file multiple complaints and/or amended complaints that were eventually dismissed by all three courts for failure to comply with such rules and orders, or for asserting frivolous claims. Third, Murrin cost nearly 50 defendants substantial time and expense in order to defend themselves against the claims alleged within those complaints.

*Aggravating and Mitigating Factors*

In addition to considering the four factors discussed above, we also may consider any aggravating and mitigating factors. *In re Aitken*, 787 N.W.2d 152, 162 (Minn. 2010). Here, the referee identified two aggravating factors: Murrin's disciplinary history and Murrin's lack of remorse. The referee's identification of aggravating factors is not clearly erroneous. Murrin admitted to his disciplinary history of two previous admonishments. Further, the referee's determination of Murrin's lack of remorse was based on Murrin's behavior and demeanor at the evidentiary hearing, and we defer to such determinations. *See In re Lyons*, 780 N.W.2d at 635.

As to mitigating factors, the referee found none. Murrin argues, however, that several mitigating factors exist. First, Murrin argues that his 35–year track record as an attorney—as well as the facts that no dishonesty is alleged and "no client has ... been hurt (other than his own self)"—should serve as mitigating factors. Murrin also appears to argue that the significant court-related sanctions imposed against him should serve as a mitigating factor. Finally, Murrin argues that "his persistence [in] help[ing] the FBI secure convictions and freeze over $400,000 for victims of the [P]onzi scheme," and his success in the United States District Court litigation should serve as mitigating factors.

With the exception of the lack of harm to a particular client, none of the factors asserted by Murrin appears to be a mitigating factor that we have considered in the past. *See Aitken,* 787 N.W.2d at 163. Moreover, the referee did not make a finding as to any of the mitigating factors asserted by Murrin. *See In re Albrecht,* 779 N.W.2d 530, 537–38 (Minn.2010) ("But the fact that the referee may treat an attorney's . . . past good results in difficult cases as mitigating factors does not mean that it is clearly erroneous for the referee to choose not to do so."). However, we take this opportunity to acknowledge specifically Murrin's success in the United States District Court litigation. As noted earlier, Murrin won a $1,760,000 default judgment against Avidigm and its CEO. That said, while we may consider whether an attorney was successful in the underlying suit giving rise to a disciplinary proceeding against that attorney, the attorney's success in the underlying suit cannot overshadow clear and continuous misconduct. Here, we recognize that Murrin's pleadings could not have been wholly frivolous because he won a default judgment. But, to the extent that Murrin named defendants in his pleadings who had been earlier dismissed from the litigation and filed claims that had been earlier dismissed from the litigation, we conclude that his pleadings were frivolous.

We also note that this case is different from most disciplinary cases in which an attorney has violated Minn. R. Prof. Conduct 3.2 and 8.4(d). In most cases, the attorney's violations of the rules arose from the attorney's *neglect* of client matters. *E.g., In re Crandall,* 699 N.W.2d 769, 770–71 (Minn.2005). This case presents the opposite circumstances: Murrin alleged misconduct arises from his overzealous *advocacy.* Thus, we seek guidance from a limited number of similar cases when determining the appropriate discipline for Murrin.

For example, in *In re Pinotti,* we suspended a lawyer for a minimum of 90 days based on the lawyer's conduct, which we said "far exceed[ed] the limits of professional representation, despite the numerous warnings of lower tribunals and heavy sanctions imposed." 585 N.W.2d 55, 63 (Minn.1998). Similar to Murrin, the lawyer in *Pinotti* "[ignored] . . . court orders . . . [and] marched relentlessly onward with a barrage of frivolous motions and appeals to the great detriment of his clients and in total disregard of the waste of judicial resources." *Id.* Also similar to Murrin, the lawyer in *Pinotti* was "unrepentant" and refused to acknowledge that his conduct violated the Rules. *Id.* at 63 (citing *In re Weiblen,* 439 N.W.2d 7 (Minn. 1989)).

In determining the appropriate discipline in *Pinotti,* we looked to *In re Jensen,* 542 N.W.2d 627, 634 (Minn.1996), in which we imposed an 18–month suspension on an attorney who "filed a frivolous claim, failed to follow the rules of civil and appellate procedure . . . and disobeyed a court order." *Pinotti,* 585 N.W.2d at 62. We also looked to *In re Nora,* 450 N.W.2d 328, 330 (Minn.1990), and *In re Graham,* 453 N.W.2d 313, 325 (Minn.1990), in which we imposed 30–day and 60–day suspensions, respectively, on attorneys who filed frivolous actions. *Pinotti,* 585 N.W.2d at 62–63. Finally, we looked to *In re Tieso,* 396 N.W.2d 32, 32–33 (Minn.1986), in which we imposed a 3–month suspension on an attorney who filed a single claim that was "groundless, frivolous and unwarranted under existing law." *Pinotti,* 585 N.W.2d at 63 (internal quotations marks omitted).

We conclude that Murrin's conduct was more extreme than that of the lawyer in *Pinotti,* if for no other reason than the sheer length of Murrin's filings and the

number of defendants burdened.[7] We understand that the particular circumstances of some lawsuits require complex and lengthy pleadings, and we note that in those circumstances, such pleadings are proper. But, when an attorney uses convoluted, frivolous pleadings—in violation of specific court orders—to delay litigation and confuse his opponents, that attorney violates the respective mandates in Minn. R. Prof. Conduct 3.2 and 8.4(d) to "make reasonable efforts to expedite litigation," and to avoid "conduct that is prejudicial to the administration of justice." Based on the record before us, we conclude that Murrin engaged in a pattern of seemingly endless pleadings that contained frivolous claims and were unnecessarily burdensome in length, violated court orders, wasted courts' resources, delayed litigation, and prejudiced the administration of justice.

Accordingly, we hold that the record supports the referee's factual findings and legal conclusions that Murrin violated Minn. R. Prof. Conduct 3.2 and 8.4(d). But, we disagree with the referee's recommendation that we suspend Murrin from the practice of law for 1 year. Instead, we conclude the appropriate discipline is a 6-month suspension with the requirement that Murrin petition for reinstatement.

Accordingly, we order that:

1.  Respondent John O. Murrin III is suspended from the practice of law in the State of Minnesota for 6 months, effective 14 days from the date of the filing of this opinion.

2.  At the end of his suspension, Murrin must petition for reinstatement to the practice of law under Rule 18(a)–(d), RLPR. Reinstatement is further conditioned upon successful completion of the professional responsibility portion of the state bar examination within 1 year of the end of his suspension.

Suspended.

---

7.  In *Pinotti,* no mention of the length of the lawyer's filings is made, and it appears the filings only affected eight or fewer defendants. *Id.* at 56–62.