PER CURIAM.
The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against respondent Carol Townsend Trombley, alleging professional misconduct for engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." Minn. R. Prof. Conduct 8.4(c). We appointed a referee who, following a hearing, found that Trombley dishonestly converted funds belonging to her stepfather for her own use, in violation of Minn. R. Prof. Conduct Rule 8.4(c). The referee recommended that we impose an admonition. Although we conclude that some of the referee's findings of fact are clearly erroneous, the record supports the referee's other findings of fact and the conclusion of law that respondent dishonestly converted funds belonging to her stepfather for her own use, in violation of Minn. R. Prof. Conduct 8.4(c). We conclude that the appropriate discipline for Trombley's misconduct is a 6-month indefinite suspension.
FACTS
Trombley was admitted to practice law in Minnesota in 2000 and has worked as both a software-licensing attorney and as an assistant general counsel.
Trombley's mother, L.S., was diagnosed with cancer in August 2013. After the diagnosis, L.S. executed a short-form power of attorney, naming Trombley attorney-in-fact and granting Trombley all available powers, including the power to transfer property from L.S. to Trombley.
Trombley did not exercise the power of attorney until her mother fell seriously ill in early April 2014. Until that time, L.S. had handled the finances for herself and her elderly husband, Trombley's stepfather C.S., who was unable to manage his finances because of his own illness. Trombley then became more involved in the lives of her mother and stepfather. By June 9, 2014, she had added her name to their joint checking and savings accounts, changed the address for these accounts to her address, and taken the couple's checkbook. On that date, she also began transferring funds from the joint savings account into the joint checking account.
Trombley made nine transfers from the joint savings to the joint checking account, totaling $114,495.09, during a 7-week period that spanned the time before and after her mother's death. As these transfers were made, and in the week before her mother's death, Trombley wrote three checks to herself, totaling $95,000, from the joint checking account and deposited the funds into her personal accounts. She signed these checks using her mother's name and did not indicate that she was doing so as attorney-in-fact. The day after she wrote the last check to herself, her mother died.
After L.S. died, Trombley retained in her personal accounts the $95,000 that she had withdrawn from the joint checking *365 account. She used $1,023.65[1] to pay for funeral and other expenses related to C.S. and L.S. She also transferred the remaining money from the joint savings account to the joint checking account and then closed the joint savings account.
Around the same time, Trombley found a copy of a will that L.S. had executed in 2003. The will bequeathed to Trombley (1) half the proceeds from the sale of the house owned by C.S. and L.S. and (2) the funds in L.S.'s retirement account. But L.S. and C.S. had sold the home after the will was executed and had deposited the sale proceeds into the same joint savings account that Trombley had closed after transferring its contents into the joint checking account. As to the retirement account, L.S. had listed C.S., not Trombley, as the account beneficiary. The will also bequeathed to C.S. "the entire residue of [L.S.'s] estate." Trombley did not seek legal advice at that time regarding the will. She claimed that she believed her mother intended for her to inherit approximately $95,000, and thus, she ignored C.S.'s rights and interests in the funds previously contained in L.S. and C.S.'s joint accounts.
After L.S. died, Trombley spent some of the funds that she had transferred to herself for her own benefit. The referee found that, approximately 2 weeks after her mother died, the balance in Trombley's bank accounts "was less than the aggregate balance of funds that [Trombley] had transferred from the two joint accounts," that this "shortage remained until June 2015," and that the "shortage reached a maximum of over $58,000 in January 2015." Trombley used some of this money to buy a car and some jewelry and to pay her "substantial financial obligations."
While L.S.'s health was failing, Trombley and her husband were dissolving their marriage. As part of the dissolution proceedings, the district court determined that Trombley and her former husband owed more than $300,000 in joint business debts and an additional $130,000 in joint personal obligations. Trombley and her former husband agreed that he would assume and "hold [her] harmless" from the business debts, and in a later proceeding, the district court concluded that Trombley would assume approximately $70,000 of the personal debts. Trombley's former husband refused to pay the business debts or otherwise indemnify Trombley as agreed, resulting in financial distress and substantial marriage dissolution litigation for Trombley.
After the death of L.S., Trombley paid some of her credit card debt that was part of the joint personal debts of Trombley and her former husband. A creditor brought an action against her to collect an additional $24,386 in credit card debt. A district court ultimately concluded that both of these obligations were the responsibility of her former husband.
Meanwhile, C.S. had growing concerns about his finances because he did not know what had happened to his money. He was worried about how he would pay his monthly rent and medical expenses. He also was unable to access funds in the one remaining account with his name, the joint checking account, because Trombley kept the checkbook for this account.
On November 1, 2014, a licensed social worker reported the financial situation of C.S. to the Minnesota Department of Human Services as possible maltreatment of a vulnerable adult. The next month, a Ramsey County investigator contacted *366 Trombley regarding her handling of C.S.'s finances. Following the investigation, the Ramsey County Community Human Services Department determined that Trombley had financially exploited a vulnerable adult, in violation of Minn. Stat. §§ 609.2335, subd. 1, 626.5572, subd. 9 (2016). Trombley requested a hearing with the state appeals office. An evidentiary hearing was held, and the Commissioner of Human Services affirmed the original determination of the Ramsey County Community Human Services Department. Trombley did not seek judicial review of this determination.
After the investigation began, but before the Ramsey County Community Human Services Department made its determination, Trombley returned $93,976.35 to C.S. This amount represented the funds Trombley had transferred into her personal accounts, minus a few uncontested expenses related to L.S.'s death. She made a partial payment in March 2015 and refunded the full amount by June 2015, a month before C.S. died.
The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against Trombley, alleging professional misconduct for engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." Minn. R. Prof. Conduct 8.4(c). Following a hearing, the referee concluded that Trombley had dishonestly converted funds belonging to C.S. for her own use, in violation of Rule 8.4(c), and recommended an admonition.[2] The Director requests that we affirm all but one of the referee's findings and conclusions and impose an indefinite suspension of at least 18 months. Trombley contends that she has not violated Minn. R. Prof. Conduct 8.4(c) and challenges several of the referee's findings and conclusions.
ANALYSIS
I.
Trombley ordered a transcript of the hearing before the referee, so "none of the [referee's] findings of fact or conclusions" of law are conclusive. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). We give the referee's findings of fact "great deference" and will not reverse them "if they have evidentiary support in the record and are not clearly erroneous." In re MacDonald , 906 N.W.2d 238, 243-44 (Minn. 2018), cert. denied , --- U.S. ----, 138 S.Ct. 2681, --- L.Ed.2d ---- (2018). When we are "left with the definite and firm conviction that a mistake has been made," we may conclude that a referee's findings are clearly erroneous. In re Albrecht , 779 N.W.2d 530, 535 (Minn. 2010) (citation omitted). We review "the application of the [Minnesota Rules of Professional Conduct] to the facts of the case for clear error," but we review an interpretation of a rule de novo. In re Aitken , 787 N.W.2d 152, 158 (Minn. 2010).
A.
We begin with the findings that Trombley challenges.[3] First, she disputes *367 the findings of fact that describe the funds that she transferred and her actions with the funds after she transferred them. Having carefully reviewed the record, we conclude that the referee did not clearly err by finding that Trombley transferred "virtually all of the funds in [C.S.] and [L.S.]'s checking account" into her personal accounts; "had no basis to claim ... that she was personally entitled to these funds as a gift to her;" "used substantial portions of the funds to pay her own expenses;" and "had substantial financial obligations and used [L.S.] and [C.S.]'s funds to help pay those obligations."[4]
Next, Trombley challenges the finding of fact that states that she exceeded the scope of her authority under the power of attorney executed by her mother. The referee found that Trombley did not exceed the scope of the power of attorney while her mother was alive, and the record supports this finding. But the referee also found that, after her mother's death, Trombley's "actions breached her fiduciary duties under the [power of attorney.]"
This finding by the referee is clearly erroneous. Minnesota law provides that a durable power of attorney terminates at the death of the principal. See Minn. Stat. § 523.08 (2016). Because Trombley's actions did not exceed the scope of the authority granted to her by the power of attorney while L.S. was alive, and the power of attorney terminated after L.S. died, the referee's finding that Trombley breached her fiduciary duties as her mother's attorney-in-fact is clearly erroneous.
Trombley next contests the referee's finding of fact and conclusion of law that her actions were dishonest. The Director argues that Trombley was dishonest before and after L.S.'s death, by both signing checks with L.S.'s signature[5] and then retaining funds that belonged to C.S. Trombley contends that her conduct was *368 not dishonest because she did not intentionally commit any wrongful acts. But the referee found that she "dishonestly converted the funds for her own use" after her mother's death, and the record supports this finding.
Before discussing the support for the referee's dishonesty finding, we address the referee's discussion of Trombley's reliance on her mother's will. After finding that Trombley's conduct was dishonest, the referee addressed Trombley's understanding of her mother's will. According to the referee, Trombley "did not seek legal advice and did not understand that the bequests [in her mother's will] had failed." The referee also stated that Trombley "assumed" that she would inherit approximately $95,000 from her mother and refers to Trombley's "claimed lack of knowledge or experience in trust and estate matters." (Emphasis added.) To the extent that the referee's statement that Trombley "did not understand that the bequests had failed" is a finding of fact, we reject it as clearly erroneous.
Not only is a finding that Trombley did not understand that the bequests had failed contradictory to the referee's other findings regarding the funds and her dishonesty, but it is also implausible. The will provided that Trombley was to receive "50% of the proceeds of the sale of [her mother's] house" and the funds in L.S.'s retirement account. The will also provided that C.S. was to receive the "entire residue of [L.S.'s] estate." It is undisputed that the house had been sold before the death of L.S., Trombley knew that it had been sold, and there were no proceeds from the sale of the house to divide, a fact that was obvious to everyone, including Trombley. It is also undisputed that Trombley knew that her mother had listed C.S. as the beneficiary of her retirement account and that Trombley did not receive the funds from this account after her mother died. Trombley neither claims that her reliance on the will was reasonable, nor cites any authority to that effect. To the extent the referee found that Trombley "did not understand that the bequests [in her mother's will] had failed," we are left with a definite and firm conviction that a mistake has been made, and we conclude that the referee clearly erred. See Albrecht , 779 N.W.2d at 535.
Turning to the referee's dishonesty finding, the record establishes that Trombley retained $93,976.35 in funds that belonged to C.S. and spent more than $58,000 of those funds for her personal benefit. Trombley did this despite having no legal basis for retaining the funds. Because Trombley's post hoc justification for retaining the funds is implausible, it supports the reasonable inference that Trombley knew the funds were C.S.'s and that she acted dishonestly by keeping them.
Trombley also provided contradictory reasons for her transfer and retention of the funds. Trombley argued first that she transferred the funds to protect the assets from the daughter of C.S. but later said she made the transfers to more easily provide for her mother's care. She insisted these transfers were not a gift to herself. However, after the death of L.S., Trombley retained the transferred funds because she claimed that the funds were equivalent to the bequests in her mother's will. She asserted, without basis in law, that she could rely on a failed will as a reason to retain the transferred funds. Trombley's inconsistent reasons for possessing these funds before and after her mother's death support the dishonesty finding.
The record includes additional instances of dishonesty that occurred after the death of L.S. Trombley testified at the hearing: "I was to make sure all [C.S.]'s bills were *369 being paid as well" and "I thought it was my duty to protect him as well." Not only does this testimony show that she assumed a duty toward C.S., as discussed below, but it also shows that she understood that he needed help with his finances. Trombley knew that the account from which the funds were transferred included C.S. as a joint owner. She retained and spent the funds that belonged to C.S. without any legal basis for doing so, and she did not return those funds until after the county began investigating her handling of the funds.
Trombley's conduct with C.S. before and after the county began investigating her for her handling of the funds also supports a dishonesty finding. Before the investigation, Trombley kept and spent the funds she had transferred from C.S. and L.S.'s accounts into her personal accounts without explaining to C.S., or anyone acting on C.S.'s behalf, what had happened to his funds or why she believed that she was entitled to keep the funds. Trombley's secrecy with respect to her conduct supports the conclusion that she acted dishonestly.
The record shows that she attempted to negotiate with C.S., in a letter,[6] for retention of some of the money after the county began investigating her. Thus, it was after Trombley knew that her conduct was being scrutinized that she attempted to convince C.S. to approve her prior conduct. And this attempted negotiation occurred despite Trombley's knowledge that C.S. was not capable of handling his finances. Trombley's actions and statements support the referee's finding that she "dishonestly converted the funds for her own use."
Finally, Trombley challenges the findings of fact that state that she ignored the rights and interests of C.S. in the formerly jointly held funds. But Trombley's arguments about these findings focus only on the time period before her mother's death and ignore Trombley's conduct and the rights of C.S. after the death of L.S. Trombley does not contest that this money belonged to C.S. after her mother's death or that C.S. had an interest in the funds during the time that Trombley retained the money. Because the record supports the findings that Trombley ignored C.S.'s interest in the funds that she retained after the death of L.S., these findings are not clearly erroneous.
B.
We turn next to the issue of whether her retention of money belonging to C.S. violated Minn. R. Prof. Conduct 8.4(c). We review the application of the Minnesota Rules of Professional Conduct to the facts of the case for clear error and the referee's interpretation of a rule of professional conduct de novo. Aitken , 787 N.W.2d at 158. Trombley challenges the referee's conclusion that she violated Rule 8.4(c), and the parties dispute what the Director must prove to establish a violation of Rule 8.4(c). According to Minn. R. Prof. Conduct 8.4(c), "[i]t is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."
Trombley first contends that, although "not explicitly stated as an element of Rule 8.4(c), it is implicit that there must be a duty or obligation that Respondent breached *370 or violated." She argues that she could not have violated Rule 8.4(c) because she owed no duty to C.S. We disagree.
We conclude that Trombley assumed a duty to care for C.S. and violated that duty by retaining his funds. At the disciplinary hearing, Trombley admitted that she assumed a duty with respect to C.S.: "I was to make sure all [C.S.]'s bills were being paid as well" and "I thought it was my duty to protect him as well." The record suggests that Trombley attempted to help C.S. to some extent after her mother died. But neither the arguments Trombley made in this disciplinary proceeding nor her underlying conduct supports a claim that she performed this assumed duty. Trombley has insisted that she did not consider the transfer of these funds to herself to be a gift. She also does not contest that these funds belonged to her stepfather. She thus violated this assumed duty to "protect him" when she retained the funds after her mother died and spent some of the funds for her own benefit.
According to Trombley, she did not violate this rule because the Director did not prove that she had an "intent to deceive." By contrast, the Director suggests that intent is not a requirement of this rule. Because the Director has proven facts that establish Trombley's intentional dishonesty, we need not decide whether intent is a requirement of Rule 8.4(c). Assuming without deciding that intent is a requirement of Rule 8.4(c),[7] for the reasons we have outlined above, we conclude that Trombley engaged in intentional dishonesty regarding her retention of her stepfather's funds.
II.
We turn next to the appropriate discipline for Trombley's misconduct. Although the referee recommended an admonition, the Director urges us to impose an indefinite suspension of at least 18 months. Because Trombley contends that her conduct did not violate Rule 8.4(c), she requests that we dismiss the petition.
The purpose of attorney discipline "is not to punish the attorney, but rather to protect the public [and] the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." MacDonald , 906 N.W.2d at 247 (citation omitted). When disciplining attorneys we "place great weight on the referee's recommended discipline," but we "retain ultimate responsibility for determining the appropriate sanction." Id. (citation omitted). To determine the appropriate discipline, "we consider four factors: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." In re Nelson , 733 N.W.2d 458, 463 (Minn. 2007). We also consider "the discipline imposed in similar cases and any aggravating or mitigating circumstances that may exist." MacDonald , 906 N.W.2d at 247.
A.
We begin with the nature of Trombley's misconduct. Trombley's misconduct did not involve the practice of law and it was limited to the funds of C.S. But her misconduct *371 did involve wrongfully withholding, and using for her personal benefit, a substantial amount of money belonging to another. Such misconduct is serious.
Next, we determine the cumulative weight of the disciplinary violations. We distinguish between "multiple instances of misconduct occurring over a substantial amount of time" and "a brief lapse in judgment or a single, isolated incident." In re Nwaneri , 896 N.W.2d 518, 525 (Minn. 2017) (citation omitted) (internal quotation marks omitted). Trombley's conduct violated only one of the rules of professional conduct, but her dishonesty concerning the ownership of the funds continued for several months between her mother's death and her return of the funds to C.S.
The final two factors we consider are the harm to the public and the harm to the legal profession. Even though she eventually returned the funds, Trombley's conduct harmed C.S., who was denied access to the funds, did not understand what had happened to his money, and worried about paying his bills. We have said that "[m]isconduct involving dishonesty is particularly serious because honesty and integrity are among the most important attributes the public has the right to expect of lawyers." In re Glasser , 831 N.W.2d 644, 648 (Minn. 2013). Because Trombley's conduct involved dishonesty, her conduct "harmed both the public and the profession by undermining the public's confidence in the honesty and integrity of lawyers." Id.
B.
We next consider the presence of any aggravating and mitigating factors. The referee found three aggravating factors and two mitigating factors. The Director challenges one mitigating factor and Trombley challenges the referee's failure to find two additional mitigating factors. "We review the referee's application of law to the facts, including any findings on aggravating and mitigating factors, for clear error." MacDonald , 906 N.W.2d at 248.
The referee concluded that Trombley's lack of recognition and remorse, Trombley's selfish motive, and the vulnerability of the victim all were aggravating factors. We have consistently concluded that each of these factors may aggravate an attorney's misconduct. See In re Severson , 860 N.W.2d 658, 670 (Minn. 2015) (lack of remorse); In re Garcia , 792 N.W.2d 434, 443-44 (Minn. 2010) (selfish motive); In re Stroble , 487 N.W.2d 869, 871 (Minn. 1992) (vulnerability of victim). The record supports the referee's conclusions on these aggravating factors.
The referee also found two mitigating factors: Trombley's stress and her lack of prior misconduct. We have concluded that "extraordinary stress" in an attorney's personal life, including loss of a loved one and other personal matters, is a mitigating factor. See In re Rooney , 709 N.W.2d 263, 272 (Minn. 2006). We conclude that the record supports the referee's finding of a mitigating factor based on stress.
The Director challenges the referee's conclusion that the absence of any record that Trombley has engaged in any prior misconduct is a mitigating factor. "Although we consider an attorney's disciplinary history as an aggravating factor, an attorney's lack of disciplinary history is not a mitigating factor but is instead the absence of an aggravating factor." Aitken , 787 N.W.2d at 162 (citations omitted). Thus, the referee's conclusion was clearly erroneous and we conclude that Trombley's lack of prior misconduct is not a mitigating factor.
Finally, Trombley argues that the referee failed to consider two other mitigating factors that she raised in her proposed findings. The first of these factors is that *372 C.S. suffered no harm. But Trombley's conduct did cause harm to C.S. Trombley deprived C.S. of approximately $94,000. C.S. suffered anxiety over not knowing the location of these funds, and he feared not being able to pay his assisted-living expenses. All of this occurred in the last year of his life. Lack of harm does not mitigate Trombley's misconduct because the record shows that C.S. did suffer harm.
Trombley also contends that the referee failed to consider the mitigating factor of her relative inexperience in the practice of law. We have said that "inexperience do[es] not mitigate acts of dishonesty." In re Ward , 563 N.W.2d 70, 72 (Minn. 1997) ; see also In re Michael , 836 N.W.2d 753, 767 (Minn. 2013) (holding that an attorney's inexperience did not "mitigate her knowingly false statement" to a court). Because this disciplinary proceeding concerns Trombley's dishonesty, her relative inexperience is not a mitigating factor.
We conclude that the referee did not err by failing to find mitigating factors relating to harm suffered by C.S. or Trombley's relative inexperience in practicing law. We conclude that the vulnerability of the victim, Trombley's selfish motive, and her lack of recognition and remorse aggravate her misconduct, and the extreme stress she was experiencing at the time of these events mitigates her misconduct.
C.
We finally consider discipline imposed in analogous circumstances to ensure that we impose discipline that is both consistent and specific to each case. MacDonald , 906 N.W.2d at 249. Although Trombley's misconduct did not involve the practice of law, the elements of her misconduct are similar to misconduct found in other attorney-discipline cases that are instructive to our decision.
One element of Trombley's misconduct is her retention of a substantial amount of funds that belonged to another. The misappropriation of client funds is an analogous and serious violation. We often disbar attorneys who misappropriate client funds, unless substantial mitigating circumstances are present. See, e.g. , In re Wentzel , 711 N.W.2d 516, 520-21 (Minn. 2006). We have imposed discipline for the misappropriation of a substantial sum of money even when the attorney returns the funds. See Rooney , 709 N.W.2d at 266, 272-73 (imposing an 18-month suspension on an attorney who did not return $27,700 in client funds until after the bank contacted the attorney about the overdrawn trust account; mitigating factors were present). Although Trombley did not misappropriate client funds, our misappropriation cases show that we treat the retention of the funds of another as a serious form of misconduct.
Trombley's misconduct also involves dishonesty. We have disbarred attorneys who have engaged in dishonesty to acquire another's funds, see In re Peterson , 456 N.W.2d 89, 91-93 (Minn. 1990), because an attorney's dishonesty regarding finances is a serious concern. In other circumstances, we have imposed a 60-day suspension for unintentional misrepresentations on tax returns, In re Grigsby , 764 N.W.2d 54, 63 (Minn. 2009), and a 2-year suspension for misconduct that included misrepresentations about the attorney's actions while she was the trustee of a trust, In re Ahl , 828 N.W.2d 109 (Minn. 2013) (order).
But we also have imposed less serious forms of discipline for misconduct involving dishonesty. We publicly reprimanded attorneys for Rule 8.4(c) violations when an attorney evaded prison rules concerning legal correspondence, In re Lillie , 707 N.W.2d 367, 367-68 (Minn. 2005) (order); altered certified documents, *373 In re Simonson , 573 N.W.2d 676, 676 (Minn. 1998) (order); and signed an affidavit that (apparently unintentionally) included a false statement, In re Kalk , 829 N.W.2d 366, 367 (Minn. 2013) (order). None of these directly involved retaining money belonging to another and all were orders based on stipulations.
Trombley's misconduct, although not identical to any specific decision of our court, has similarities to other discipline decisions. Trombley's misconduct involves improperly retaining a substantial sum of money belonging to another, which she spent on herself and did not return until she was investigated. Her misconduct also includes violating an assumed duty and retaining and using the funds of an adult who was incapable of handling his own finances. Finally, her misconduct involves dishonesty. Her misconduct is certainly distinguishable from-and not as severe as-the cases where we have disbarred attorneys for misappropriation. Having considered the aggravating and mitigating factors present here, and recognizing that our precedent does not include misconduct identical to Trombley's actions, we hold that the appropriate sanction for Trombley's misconduct is a 6-month suspension.
Accordingly, we order that:
1. Respondent Carol Townsend Trombley is indefinitely suspended from the practice of law, effective 14 days from the date of this opinion, with no right to petition for reinstatement for 6 months from the effective date of the suspension.
2. Respondent shall comply with the requirements of Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals), and shall pay $900 in costs, plus disbursements, pursuant to Rule 24, RLPR.
3. If respondent seeks reinstatement, she must comply with the requirements of Rule 18(a)-(d), RLPR. Reinstatement is conditioned on successful completion of the written examination required for admission to the practice of law by the State Board of Law Examiners on the subject of professional responsibility and satisfaction of continuing legal education requirements. See Rule 18(e)-(f), RLPR.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

This is the difference between the $95,000 and the $93,976.35 that she later returned to C.S. The parties do not dispute that this amount represents costs paid on behalf of L.S. and C.S.

The referee used the term "private reprimand." That term is not found in the rules addressing the forms of discipline that may be imposed on a lawyer who has committed professional misconduct. See Rules 8(d), 9(j), Rules on Lawyers Professional Responsibility (RLPR) (addressing the dispositions that the Director or a panel of the Lawyers Professional Responsibility Board may impose), Rule 15(a), RLPR (addressing the dispositions that we may impose in disciplinary proceedings). One form of nonpublic discipline is an admonition. See Rules 8(d)(2), 9(j)(1)(iii), RLPR. We believe that the referee was referring to an admonition in recommending that a "private reprimand" be imposed.

In addition to challenging these specific findings, Trombley also challenges the referee's generalized finding about the Human Services proceedings. Trombley contends that the referee erred by relying on the Department of Human Services determination that she financially exploited a vulnerable adult, arguing that the Director is improperly relying on the doctrine of offensive collateral estoppel. See In re Murrin , 821 N.W.2d 195, 205 (Minn. 2012). But parties in disciplinary proceedings forfeit arguments that were not initially raised before the referee. See In re Tayari-Garrett , 866 N.W.2d 513, 520 (Minn. 2015). Trombley neither objected to the admission of evidence related to the administrative proceedings at the evidentiary hearing before the referee nor argued that the Director improperly relied on the doctrine of offensive collateral estoppel. Accordingly, her argument is forfeited.
Trombley also challenges the interpretation of the law in the initial Ramsey County Human Services determination. Because Trombley did not appeal the administrative decision for judicial review by the district court, see Minn. Stat. § 256.045, subd. 7 (2016), the issue of whether the Commissioner of Human Services properly applied the law is not before us.

Trombley also challenges a transaction listed by the referee in finding of fact 14: that she withdrew $95.09 in cash after her mother died. The record shows, and the Director agrees, that this $95.09 is not part of the $95,000 that Trombley transferred to herself. Nonetheless, this error is not relevant to whether Trombley engaged in conduct involving dishonesty. See Minn. R. Prof. Conduct 8.4(c).

An attorney-in-fact that signs the current short-form power of attorney statute acknowledges that the attorney must disclose, when signing documents for the principal, that the attorney acts under a power of attorney. Minn. Stat. § 523.23, subd. 1 (2016). But the version of the statute that applies to L.S.'s power of attorney does not clearly indicate how attorneys-in-fact must sign documents and does not expressly prohibit the manner of signing used by Trombley. See Minn. Stat. § 523.23 (2012). The record does not support a finding that this act itself was dishonest. Trombley had signed other routine checks with her mother's name during this period.

Trombley contended at oral argument that the Director did not plead this letter in the petition and thus asserted a new ground for discipline by referencing it. We disagree. The Director pleaded dishonesty in the petition, and Trombley introduced this letter into the record at the hearing. The Director is not required to plead every piece of evidence that supports the claim of dishonesty, and it is not relevant who introduced the letter into the record.

We have touched on whether this rule includes an intent requirement on other occasions. Compare In re Varriano , 755 N.W.2d 282, 290 (Minn. 2008) (stating that "[a] violation of 8.4(c) thus implies an intentional act by the attorney" and upholding the referee's finding that the attorney did not violate Rule 8.4(c) because he did not act "in an 'intentionally dishonest manner' "), with In re Grigsby , 764 N.W.2d 54, 61 (Minn. 2009) ("Nor is Rule 8.4(c) limited, by its terms, to intentional misrepresentations; rather, the rule makes it professional misconduct to engage in dishonesty, deceit, or misrepresentations, as well as fraud."). We do not, however, need to conclusively resolve that issue here.